## COURT OF APPEALS.

### July, 1923.

## THE PEOPLE v. ANTONIO MONTESANTO.

### (236 N. Y. 396.)

(1) MURDER IN FIRST DEGREE—WHERE CASE IS CLOSE AND DOUBTFUL, ERRORS OR OMISSIONS ASSUME GREAT IMPORTANCE.

Where the case against an appellant from a judgment convicting him of murder in the first degree was a close and doubtful one and the determination of his guilt depended upon inferences which the jury might draw, error or omissions which, had the case been clearer, might have been overlooked, assume great importance, and this court must see that the jury was not misled.

(2) SAME.

Where, in view of the evidence as it was developed upon the trial, defendant and an alleged accomplice were so linked together that it must be assumed that both were guilty of the homicide or that neither was guilty, it was error for the court to refuse to charge that, if the jury find that the alleged accomplice did not leave his house on the night of the murder, they must acquit under the evidence where their only instruction on the subject had been that if such evidence raised a reasonable doubt as to whether defendant was there when the killing was committed that doubt must be resolved in his favor. Defendant was entitled to the further charge requested or, at least, to some further explanation as to the effect of a finding that the alleged accomplice was not present when the homicide was committed.

(3) SAME—TRIAL—INSUFFICIENT INSTRUCTION TO JURY ON VITAL ISSUES.

Where the conviction of defendant could not have been had except for testimony of the wife of decedent identifying him as the man who shot her husband and there was testimony in the case as to statements of the deceased and his wife at the time of the homicide that they did not know the murderers and as to subsequent testimony of the wife before the coroner to the same effect, a mere passing comment by the court on this situation and a reply to a request to charge specifically thereon, that the jury should take into consideration all the testimony in the case, is an entirely insufficient presentation to the jury of a vital question upon which the life of the defendant depended.

(4) SAME—FAILURE TO ANALYZE EVIDENCE—DEFENDANT NOT AFFORDED A
  FAIR TRIAL.
    In view of the two matters above discussed, taken in connection
  with the failure of the court generally to analyze the evidence in the
  so as to present to the jury fairly the conflicting claims of the
      and the defendant, it must be held that the latter was not
    led a fair trial. (People v. Odell, 230 N. Y. 481, 488, approved.)

    . rgued May 9, 1923; decided July 13, 1923.)

APPEAL from a judgment of the Supreme Court, rendered
July 24, 1922, at a Trial Term for the county of Monroe
upon a verdict convicting the defendant of the crime of murder
in the first degree.

*James Mann* and *Herbert D. Thomas,* for appellant. The
verdict is contrary to the weight of evidence. (People v.
Becker, 210 N. Y. 274; People v. Parretti, 234 N. Y. 98.)

*William F. Love, District Attorney (Marsh N. Taylor,* of
counsel), for respondent. The defendant has had an
impartial trial. The evidence proved his guilt beyond
a reasonable doubt and justice requires an affirmance
of the judgment and order appealed from. (People v. Tay-
lor, 138 N. Y. 398; People v. Rodawald, 177 N. Y. 408;
People v. Long, 150 App. Div. 500; 206 N. Y. 693.)

ANDREWS, J.:

Carmelo Genevola had a small butcher shop in the city of
Rochester. It fronted upon the street and in the rear were
apartments where he and his wife lived. Some time after
ten o'clock of the evening of November 12, 1921, two men
entered the shop and after some conversation shot Genevola,
inflicting a fatal wound, and also shot his wife, who, on hear-
ing the conversation, had appeared at the rear door. The
men were unmasked and are described as young Italians, one
a " short man " and one a " tall man." After the shooting

they escaped to a waiting automobile in a street around the corner. Some weeks later two young men respectively twenty-two and twenty-five years old named Antonio Montesanto and Carmelo Faraci were arrested for the crime. The former has been tried and convicted and the latter is still confined pending his own trial.

Faraci was the nephew of the wife of a brother of the deceased. He was well known to Genevola and to his wife. Montesanto also had been well known by both for several months before the homicide. He seems never to have previously come in conflict with the Penal Law and there is testimony uncontradicted by the State that his character had been good.

The theory of the State is that the homicide was the culmination of an unsuccessful attempt at extortion. It seems that for some time the deceased had been receiving so-called black-hand letters. The first was a request to bring $1,000 to a fixed place. The deceased gave this letter to his brother Cologero Genevola asking him to show it to Faraci and to see if Faraci could not discover the author. The next day Faraci came to the shop of Cologero. There is nothing to indicate that this was not an ordinary call such as he was accustomed to make. Cologero Genevola handed the letter to Faraci, asking him to read it and while he was reading it Montesanto also called as was his custom. Cologero then showed the letter to Montesanto requesting him to find out, if he could, who had written the letter and Faraci and Montesanto departed with it and made or pretended to make an effort to do so. A second letter soon came to the deceased and again Montesanto and Faraci were consulted about it. Montesanto knew of a Rochester Italian named Luigi Moia who had a bad reputation and it occurred to him that Moia was either the author of the letters or could find out who the author was. He says that he and Faraci had conversations with Moia which they reported to the deceased, and that Moia

told him, and he reported, that the letters might be destroyed as everything had been arranged; and the two letters were thereupon destroyed. That he made such a report and that the letters were in consequence destroyed is conceded. It may be noted that Moia denies any such conversations between himself and Montesanto. Apparently, however, Montesanto attempted to arrange in good faith an interview between Cologero and Moia. If he did it would corroborate his story. It also appears that in his talks with Montesanto the deceased and his wife had spoken of appealing to the police. On one occasion, at least, when such a purpose was expressed, Faraci replied " all right." In a third letter subsequently received the author said that he understood that Genevola spoke of going to the police but that if he did so it would be the worse for him. Finally a fourth letter was received containing a threat to kill the whole family. All this time the deceased was appealing to the defendant and Faraci for help and they were promising to assist him. Almost daily consultations occurred. On one occasion Montesanto wanted twenty-five or thirty dollars to have a celebration for the purpose of getting the men together who were writing the letters so that the police might arrest them. And on various occasions money was spoken of but apparently only small sums were mentioned to compensate Montesanto for his time and for a loss in his business.

The jury was asked to infer either that Montesanto and Faraci were the authors of these letters or that they knew who the authors were and were engaged in a conspiracy to extort money from Genevola. As substantiating this inference the People point to the knowledge which the author evidently had of the likelihood of an appeal to the police; to his knowledge of a certain visit to a stone quarry to meet the blackmailers; to the fact that on Montesanto's statement the first two letters were destroyed; to the fact that Moia denies the conversation reported to have been had with him and to the fact that the

plan for a feast and the subsequent arrest of the guilty parties seems incredible. On the other hand, the defendant and Faraci, at least during the early part of the transaction, were assuring the deceased that he had nothing to fear, that everything was settled and that they would discover who was behind the letters. Such a line of action seems inconsistent with the theory which the State adopted. Further, their connection with the business originated in requests by Genevola for aid and not because of any act or word of theirs. On the whole the inference is at best a possible one.

The exact hour of the homicide may not be fixed. The call for the police came at 10:35. Various witnesses who heard the shots and the ensuing commotion estimate the time at from 10:20 to 10:30. For some minutes before the actual shooting the automobile in which the murderers escaped had been standing in the side street. Two witnesses, Louis Polino and Anthony Arena, saw the murderers shortly aften ten o'clock as they were approaching and entering the store. The former knew Montesanto but not Faraci. He testifies that Montesanto was not one of these men. Arena knew both the accused and he says that neither of them were the two men that he saw. A Mrs. Marks and her daughter saw the murderers as they escaped to the automobile. Neither could identify them but Mrs. Marks says that one of the men was six inches taller than the other, and Miss Marks refers to them as the " short one " and the " tallest one " and describes one as " real tall." Montesanto is five feet four and a half or four and three-quarters inches in height. Faraci is two inches shorter.

After the shooting Mrs. Genevola ran to the door of the store shouting for help. A crowd gathered. Among those who soon reached the place of the homicide was a Dr. Bondi, a physician of Rochester, and so far as appears entirely disinterested, Detective Cloonin, Officer Barry and a boy named John Cali. Both Mr. and Mrs. Genevola were conscious but both failed to identify Montesanto and Faraci as the men who

had done the shooting.    Mrs. Genevola referred to them consistently as the " tall one " and the " short one " and she told Dr. Bondi, as he says, that she did not know who they were but would know them if she saw them again.    Detective Cloonin had a talk with her and he says she did not give the names of the assailants but said that she would know them if she should see them again and that she did not know them. Detective Murphy had a similar talk with her the next day. Mrs. Genevola herself denies that the conversation took precisely this form but she does not assert that she gave the names of the murderers and explains it by stating that the officers did not ask her.    Neither did she then mention the defendant or Faraci to her sister or her sister's husband or to other relatives.    As to the husband, Dr. Bondi says that upon his arrival he asked the deceased what was the matter.    The latter replied, " Somebody shot me," and stated that he did not know who did it but that he would be able to recognize him if he saw him again.    He said the assailants were two strangers. The boy Cali says that one Sponiola, a brother-in-law of the deceased, who was also present, asked if he knew who had shot him and deceased replied, " I do not know the name; if I saw them again I would recognize them."    This is not denied by Sponiola, although he was present at the trial.    The next morning at the hospital the deceased was still conscious but weak.    He held up his fingers to indicate that two men had assailed him but he did not mention their names.    The further record as to Mrs. Genevola is still more curious.    A coroner's inquest was held on December 20th.    She then testified that she saw the faces of the murderers and could probably identify them at the time but she did not know if she could identify them when she testified.    She knew they were Italians but she had never seen them before.    Further, in a private talk with her brother-in-law, Cologero, after the funeral of the deceased, she told him that two men came into the store, one short and one tall, but she did not attempt to identify

Montesanto and Faraci as these two men although Faraci had ridden to the grave in the same carriage with Cologero. A Mrs. Alberti says she told her also after the arrest of Montesanto that she did not know the men who shot her husband. Four weeks later she did identify them to Cologero; she identified them to the police saying that she had not spoken before because she was afraid and she identified them on the trial of the defendant. There are some indications, however, that she had come to believe that they were connected with the blackhand letters and that they knew or could find out who did the shooting. A witness for the defendant testifies, for instance, that the widow told her, referring to Montesanto after his arrest, "If he doesn't know it he ought to know; he knows who did it."

Upon the trial the defendant attempted to establish an alibi not only for himself but for Faraci. It will be remembered that the murder occurred before 10:35, at which time the police were notified, and apparently between 10:20 and 10:30. Before this time the automobile in which the murderers escaped had been noticed in the side street. The defendant was engaged to a Miss Sigsbee. He says that he accompanied her to a moving picture theatre on the evening in question, leaving it after nine o'clock; they then went to the office of the *Times-Union,* a Rochester newspaper, and talked with Miss Sigsbee's father who is there employed; he remained there until about ten o'clock at which time he placed Miss Sigsbee on a Rochester and Syracuse car to go to her home in East Rochester; after the car had left he went to Main street to wait for a Central Park car to take him home; he boarded that car and on it he met one Tony Sardisco; they rode to a point between Union street and Central Park where they parted. The distance from the place where he boarded the car and where he left it is about a mile and three-quarters. The running time was eighteen or twenty minutes. Charles Sigsbee, Miss Sigsbee's father, was a witness for the People.

He corroborates the defendant as to his being at the *Times-Union* office about ten o'clock and as to his leaving the office with the daughter, the latter intending to take the car for home.  Tony Sardisco says that he met the defendant on the Central Park car.  He himself had been at a picture show until after ten o'clock.  He says that when they parted it was between half-past ten and eleven.  The defendant's father reached home about 10:45.  He says he found Montesanto there.  In this he is corroborated by his wife and daughter. This alibi is somewhat shaken, however, by statements made by Montesanto when examined by the police and by the evidence of his brother.  As to Faraci, he lived three-quarters of a mile from the scene of the crime.  His father died the day before the homicide.  The funeral was held on November 12th and a number of relatives and friends gathered and remained in the house for that night.  Among these relatives was the deceased's brother, Cologero, who was at the Faraci house according to his own story until a quarter after nine o'clock in the evening.  When he left Faraci was there.  The mother of Faraci testifies that Faraci was home the entire night.  She is corroborated by five other witnesses.  Some of them say, as does Charles Troisi, that Cologero Genevola did not leave the house until after ten.

Some four or five days after the homicide the defendant left Rochester and went to Brooklyn where he remained two weeks under an assumed name.  His explanation is that this was the result of a quarrel with his mother and family with regard to his engagement to Miss Sigsbee; that his mother told him to leave the house and no longer use his father's name.  In a statement to the police he stated that the quarrel with his mother was with regard to his work.  Both may be true.  He was reproached, he says, for devoting too much time to Miss Sigsbee.  He then returned to Rochester and remained there for nearly a week, meeting Cologero Genevola and other relatives of the deceased.  He says that one of them

named Lo Grosso demanded that the defendant denounce Moia to the police as the murderer and upon his refusal Lo Grosso replied, "All right, remember." The defendant says he was frightened and again went away to New York where he remained for a short time, then returning to Rochester where he remained for two or three days preceding his arrest. The fact that while he was in Rochester on the first occasion he did talk with Cologero Genevola and Lo Rosso is corroborated by them although they do not agree as to the details of the conversation. Different inferences may be drawn from defendant's absence from the city. It may be a flight showing a consciousness of guilt or it may have been entirely disconnected with the homicide as the defendant claims. At least it is apparent that before he left Rochester and upon his various returns he did not conceal himself. It also appears that after the defendant's arrest he denied that he was acqquainted with Faraci. He subsequently admitted that he knew him. His explanation is that the American pronunciation of the name was so different from the Italian that he did not identify the person intended by the police, although at one point he does say he did not know Faraci's last name.

The case against the appellant, therefore, was a close and doubtful one. The determination that he was guilty depends upon inferences which the jury might doubtless draw. But errors or omissions which had the case been clearer might have been overlooked, here assume great importance. The jury was entitled in its difficult task to every aid which the court could give it. We must see that it was not misled.

In view of the evidence as it was developed Montesanto and Faraci are so linked together that it must be assumed that both were guilty of the homicide or that neither was guilty. The jury might not fairly find that Montesanto was present and Faraci absent. The court was asked to charge that if they find that Faraci did not leave his house that Saturday night they must acquit under the evidence. He refused. That

this was quite a possible finding in view of the testimony of the various witnesses that have been mentioned cannot be disputed. The jury had been told that if this alibi evidence, both as to Faraci as well as to Montesanto, raises a reasonable doubt as to whether the defendant was there when the killing was committed that doubt must be resolved in the defendant's favor. We think the defendant was entitled to the further charge requested. Or, at least, to some further explanation as to the effect of a finding that Faraci was not present when the homicide was committed. As we have said before, if he was absent there is no justification for holding the defendant guilty. Nor are we satisfied that the comments made by the court as to the statements of the deceased and his wife at the time of the homicide, that they did not know the murderers and as to the subsequent testimony of Mrs. Genevola before the coroner on the same subject, indicated to the jury with sufficient clearness the importance of these matters. As a whole the charge was a bald one, making little reference to the evidence or placing before the jury in any clear way the issue of fact which they were called upon to decide. As we said in People v. Odell (230 N. Y. 481, 488): "The better practice for the court in a criminal case, emphatically in a capital case, even when uninvited by the defendant, is to present to the jury the case on trial in all the phases in which the jury ought to consider it. * * * The trial judge should not as a rule limit himself to stating good set terms of law culled from the codes and the reports. Jurors need not legal definitions merely. They require proper instructions as to the method of applying such definitions after reaching their conclusions on the facts." In that case we affirmed because the guilt of the defendant seemed clear.

In the case at bar the conviction of the appellant could not have been had except for the testimony of Mrs. Genevola upon the trial identifying him as the man who shot her husband. Upon this subject the court in his main charge said only:

" The People also have called your attention to the evidence of the widow of the dead man, who has said on the stand that these two men were the men who did the shooting and she knew them at the time and gave the reason why she did not identify who these two men were on several occasions. Then there is also evidence to the effect that she said she did not know them. This bit of evidence, gentlemen, you must take into consideration also." The reference to the reasons given by Mrs. Genevola for her failure to identify the murderers is unsatisfactory. She was asked this question by the People and it was ruled improperly, it is true on the objection of the defendant; and she did say on one occasion that four weeks after the homicide she did identify them to the police saying she had not spoken before because she was afraid, and on another that she did not name them because she was not asked to do so. But passing this matter the jury were entitled to have something more than a mere passing comment on this situation. The counsel for the defendant endeavored to correct it. He asked the court to charge the jury that they must take into consideration on the question of reasonable doubt the fact that Mrs. Genevola did not disclose the identity of the defendant following the shooting of her husband, and on that point especially her sworn testimony before the coroner when she said she never saw those men before who shot her husband. And further that they should take into consideration the statement of the deceased just after he was shot that the men who shot him were strangers whom he did not know. The court replied that the jury should take into consideration all the testimony in the case.

This was an entirely insufficient presentation to the jury of the vital question upon which the life of the defendant depended.

In our opinion, in view of these two matters, taken in connection with the failure of the court generally to analyze the evidence in the case so as to present to the jury fairly the con-

2

flicting claims of the People and the defendant, the latter was not accorded a fair trial.

The judgment must, therefore, be reversed and a new trial ordered.

HISCOCK, Ch. J., HOGAN, CARDOZO and CRANE, JJ., concur; POUND and MCLAUGHLIN, JJ., dissent and vote for affirmance under section 542 of the Code of Criminal Procedure.

Judgment of conviction reversed, etc.