THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* HARRY CASHIN, Appellant.

(Argued June 13, 1932; decided July 19, 1932.)

*James D. C. Murray, Sidney S. Meyers, Irving Green-berg* and *Daniel Kirchman* for appellant. The verdict was against the weight of credible evidence. (*People* v. *Arata*, 255 N. Y. 373; *People* v. *Fiori*, 108 N. Y. Supp. 416; *Osborn* v. *Seligman*, 81 N. Y. Supp. 346; *People* v. *Speckler*, 255 N. Y. 408; *People* v. *Cassidy*, 146 N. Y. Supp. 15; *People* v. *Smith*, 7 N. Y. Supp. 841; *People* v. *Mayer*, 117 N. Y. Supp. 520; *People* v. *Moyer*, 174 N. Y. Supp. 321; *People* v. *Allocco*, 170 N. Y. Supp. 881; *Moller* v. *Moller*, 115 N. Y. 466; *McCarthy* v. *McCarthy*, 143 N. Y. 235; *People* v. *Eng Hing*, 212 N. Y. 381.)

*Thomas C. T. Crain, District Attorney (Robert C. Taylor* of counsel), for respondent. The People's case

was fully proved. (*People* v. *Roper*, 259 N. Y. 170; *People* v. *Taylor*, 138 N. Y. 398; *People* v. *Egnor*, 175 N. Y. 419; *People* v. *Cohen*, 223 N. Y. 406; *People* v. *Rodawald*, 177 N. Y. 408; *People* v. *Lytton*, 257 N. Y. 310.)

HUBBS, J. The defendant has been convicted of murder in the first degree. It is charged that he was one of two bandits who participated in a hold-up in a speakeasy at No. 49 Lexington avenue, New York city. The defense was an alibi. The principal question for determination in this court is whether the jury was justified on the evidence in finding beyond a reasonable doubt that the defendant was present and participated in the hold-up.

At about eight o'clock in the evening of February 19, 1931, there were four men in a speakeasy at No. 49 Lexington avenue. Ponzer was the bartender. Goldstein was the proprietor. White and Fieldburg were customers. There was also present a woman twenty-four years of age who went under the assumed name of Gladys Clayton. Ponzer was behind the bar. The other four individuals were in a room adjoining the barroom. The three men were engaged in playing a game of cards and the woman was sitting at the table watching the game.

At that time two men entered the barroom and ordered beer. Shortly thereafter they directed the occupants of the room to hold up their hands and covered them with their revolvers. While one of the bandits was taking the personal property from the persons of the men present, two detectives, Christopher Scheuing and Dominic Pape, entered the barroom. They were commanded by the bandits to go into the room where the card table was and were told that they were covered. In obedience to the command they walked through the barroom into the adjoining room, when the detective Pape, with the courage characteristic of most police officers, suddenly

pulled his revolver and commenced shooting. Officer Scheuing had on his overcoat and gloves and did not succeed in pulling his gun, but with the same courage displayed by Pape he made an attempt to seize one of the bandits, but either fell or was shot before he reached him. As a result of the affray, Officer Scheuing and one of the bandits were killed. One of the bandits escaped and it is charged that the defendant is the one.

While the bandits were holding up the occupants and before the detectives entered, another woman known as June Clayton entered the barroom. She was forced into the sitting room with the other occupants. Immediately after the affray, all those who were present were taken to the police station. The dead bandit was identified as Albert Checchia. During the previous year the defendant had worked for a short time for Checchia as a truck driver. Between eleven and twelve o'clock that night two detectives went to the home of defendant at No. 120 Tenth avenue. While they were on the street near his home, the defendant arrived in a taxicab. He was taken by the detectives to the police station and questioned in an effort to find out who Checchia's companion was. While he was in the police station, all of the others who were in the speakeasy during the affray were also present. None of them identified the defendant as the bandit who had escaped. After being questioned, he was permitted to go. He told the police officers that he did not know who was with Checchia and did not know anything about the hold-up; that he had been calling on a young lady by the name of Rose O'Donnell, with whom he had kept company for about two years.

About two weeks later, Detective Pape called at his house and he was asked to go to the police station and told that the lieutenant wanted to speak to him. He went there and was questioned again as to who was with Checchia on February 19th, and was again permitted

to go. On April 6th his mother informed him that Detective Pape was looking for him and that District Attorney Cohen wanted to see him the next morning at ten o'clock. The next morning, at the time stated, he went to see District Attorney Cohen and was placed under arrest. During all the time from February 19th, until arrested, he had been at home, and on all occasions when requested had gone to the District Attorney's office and been questioned. There is no evidence that he made any attempt to escape.

On different occasions before the trial, Goldstein, White, Fieldburg and Ponzer refused to identify the defendant as the escaped bandit. Upon the trial they were called as witnesses and persisted in stating that they were unable to identify the defendant as the man who was with Checchia engaged in the hold-up. Detective Pape was called as a witness and he testified that he could not identify the defendant although he stated that he resembled the man who escaped. The woman known as Gladys Clayton stated in the police station and in the District Attorney's office that she could not identify the defendant as the escaped bandit. Not until April 7th, 1931, about seven weeks after the commission of the crime, did this witness state that the defendant was the man who escaped. She was called as a witness in the Magistrate's Court and testified that she could not say that the defendant was one of the men engaged in the hold-up. Upon this trial, she stated that she had testified falsely in the Magistrate's Court. She was the only witness who attempted to identify the defendant as the bandit who escaped. If the conviction of the defendant should be sustained, it must be upon her testimony.

The defendant at the time in question was nineteen years of age; was a bricklayer by occupation and had never been convicted. He testified that on the night in question he called upon Rose O'Donnell, reaching her

home about twenty minutes of eight o'clock and remaining until after eleven o'clock. Rose O'Donnell corroborated that testimony. Her aunt, Rose Grady, with whom she lived, testified that she saw the defendant at her home where Rose O'Donnell was present, and had a conversation with him, about quarter-past eleven, on the night of February 19, 1931; that he was not nervous and did not act out of the ordinary and that he left her house about eleven-thirty. Irene Kennedy, a married sister of the defendant, testified that she saw him between seven and seven-fifteen P. M. when he left the house and that he said he was going to the home of his lady friend, Rose O'Donnell. She also testified that she saw him again that night between eleven-forty-five and twelve o'clock.

Norman Feingold testified that he was a taxi driver, married and lived with his family; that on the 20th of February he read in a newspaper that a shooting had taken place at No. 49 Lexington avenue, and he recognized a picture in the paper as being that of one of two men whom he had driven to those premises the night before. The picture was that of the deceased bandit, Checchia. He mentioned the fact to someone and the next day Detective Pape came to see him. He was taken to the police station by the detective and asked to identify the defendant, who was present. He told the police officers that the defendant was not the man who was in company with the deceased man Checchia in his taxi. He testified that between eight-thirty and nine P. M. on February 19th, at Twenty-third street and Tenth avenue, Checchia and another man walked over to his cab and directed him to drive them to 49 Lexington avenue. He drove them there and they got out of the cab and paid the fare. One of the men was Checchia, whose picture he saw in the paper the next day. He testified that he had had a good look at both of the men; that Checchia got into the cab while the other man

went to purchase some cigarettes. After he returned from purchasing the cigarettes, he walked over to the cab and told the witness to take him to 49 Lexington avenue. The witness stated that the defendant was not the man who was in his cab with Checchia, and whom he let out at 49 Lexington avenue.

Character witnesses were called by the defendant who testified to his reputation in the community as that of a peaceful, law-abiding citizen. Different witnesses referred to the man who escaped as a man about twenty-five to thirty years of age, a husky fellow with a dark complexion, either an Italian or a Jew. The defendant is an Irishman, and not of a dark complexion.

Detective Pape immediately after the affray gave the police department a description of the bandit who escaped. He described him as twenty-four years old, five feet seven or eight inches high, weighing about 145 pounds, and that he wore a mixed brown suit and blue overcoat and light Fedora hat; that he had a dark complexion. He even stated the color of his shoes. It should be borne in mind that this officer was a trained observer. He had been a detective for over six years. He was able, from what observation he had, to give a detailed description of what the man wore, his weight and age, and that he was of a dark complexion. Still, within four hours after the affray when confronted by the defendant, he could not say that he was the man who escaped. The defendant when arrested wore a gray overcoat. He and Rose O'Donnell testified that he did not have any other overcoat. Detective Pape stated that the man who escaped wore a blue overcoat.

It is a fair inference from the evidence that the man who escaped was hit by one or more bullets from Detective Pape's revolver. Officer Pape testified that when he shot at him he fell against the bar. There is no evidence that the defendant on that night within four hours after

the shooting showed any evidence of being wounded. There are various discrepancies in the testimony of the witness Gladys Clayton upon minor points. It is undisputed that she refused to identify the defendant on different occasions and testified in the Magistrate's Court that she did not know whether he was the man who escaped. She is a self-confessed perjurer and common prostitute. She testified that she had been working the speakeasy for nine months prior to the killing. The woman known as June Clayton was not called as a witness by the District Attorney, although she was present and had the same opportunity to observe as those who were called as witnesses. It is conceded that she was present in the court house in the charge of a police officer. The explanation of the District Attorney for not calling her was that she was unable to identify the defendant as the man who escaped. She should have been called.

In an affidavit made upon a motion for a new trial on the ground of newly-discovered evidence she swore that the defendant was not the man who escaped. On the record before us we feel that the ends of justice require that the defendant should have a new trial. While we are satisfied that the trial court was justified in its discretion in denying the motion made by the defendant for a new trial upon the ground of newly-discovered evidence under the well-established principles governing the decision of such a motion, still our feeling that this is a case where this court should grant a new trial is strengthened by disclosures made in the affidavits used upon that motion and facts testified to before the court upon that hearing. It is not the duty of this court to constitute itself a jury and determine from an examination of the printed record whether the defendant is guilty. That was the province of the jury. If the evidence in a case presents a question of fact, and there is sufficient evidence fairly to justify a jury in finding that a defendant's guilt has been established beyond a reasonable

doubt, this court cannot disturb the jury's finding. Any other rule would place upon the court a duty and burden too heavy to bear. The general principle is firmly established. (*People* v. *Roper*, 259 N. Y. 170; *People* v. *Cohen*, 223 N. Y. 406; *People* v. *Lytton*, 257 N. Y. 310.)

The converse of the rule is also well established. That a record discloses some evidence which constitutes a question of fact which in the first instance must be submitted to a jury, does not permit us to close our minds to the fact that such evidence may not be sufficient to justify a jury in finding the issue in favor of the People beyond a reasonable doubt.

"It is not sufficient * * * that there be some evidence from which the jury could have found a verdict against the defendant." (*People* v. *Guadagnino*, 233 N. Y. 344, 349.)

We are required by statute to grant a new trial where the judgment is death, if we are satisfied that the verdict is against the weight of evidence or that justice requires a new trial. (Code Crim. Pro. § 528; *People* v. *Becker*, 210 N. Y. 274; *People* v. *Driscoll*, 107 N. Y. 414; *People* v. *Spickler*, 255 N. Y. 408.)

We are satisfied that the ends of justice require a new trial in this case.

The judgment of conviction should be reversed and a new trial ordered.

POUND, Ch. J., CRANE, LEHMAN, KELLOGG, O'BRIEN and CROUCH, JJ., concur.

Judgment of conviction reversed, etc.