The People of the State of New York, Respondent, v. Fiore Pignataro, Edward Grimaldi and Fiore Grimaldi, Appellants.

(Argued November 27, 1933; decided January 9, 1934.)

*Harry G. Anderson, Samuel S. Leibowitz* and *Joseph H. Stein* for Fiore Pignataro, appellant. It was reversible error for the trial court to charge the jury that the alleged statements of the defendant Pignataro were voluntary as a matter of law. (*People* v. *Doran,* 246 N. Y. 409; *People* v. *Jackerson,* 247 N. Y. 36; *People* v. *Walker,* 198 N. Y. 329; *People* v. *Marendi,* 213 N. Y. 600; *People* v. *Todoro,* 224 N. Y. 129; *Commonwealth* v. *Cuffee,* 108 Mass. 285; *Commonwealth* v. *Culver,* 126 Mass. 464; *Commonwealth* v. *Preece,* 140 Mass. 276; *DiCarlo* v. *United States,* 6 Fed. Rep. [2d] 364; *People* v. *Zigouras,* 163 N. Y. 250; *People* v. *White,* 176 N. Y. 331; *People* v. *Pantano,* 239 N. Y. 416; *People* v. *Barbato,* 254 N. Y. 170; *People* v. *Alex,* 260 N. Y. 425.) There is no evidence from which the jury could properly find that the defendant Pignataro was connected with the person or persons who committed the crime, and the submission of that question to the jury was reversible error. (*People* v. *McKane,* 143 N. Y. 455; *People* v. *Smith,* 232 N. Y. 239; *People* v. *Ledwon,* 153 N. Y. 10; *People* v. *Gluck,* 188 N. Y. 167; *People* v. *Snyder,* 246 N. Y. 491.)

*Louis E. Drago, Milton E. Weintraub* and *William A. Bacher* for Edward Grimaldi, appellant. The verdict was against the weight of credible evidence. (*People* v. *Ledwon*, 153 N. Y. 10; *People* v. *Evans*, 40 N. Y. 1; *People* v. *White*, 176 N. Y. 331; *People* v. *Cashin*, 259 N. Y. 434.) The court improperly admitted in evidence the declarations of Pagano in the station house. (*People* v. *Rutigliano*, 261 N. Y. 103; *People* v. *Sobieskoda*, 235 N. Y. 411; *People* v. *Purtell*, 243 N. Y. 273.) It was reversible error for the court to admit the testimony of Pagano as to the threat alleged to have been made by a brother of the defendant. (*People* v. *Buzzi*, 238 N. Y. 390; *Hamel* v. *Brooklyn Heights R. R. Co.*, 59 App. Div. 135; *McCoy* v. *Munro*, 76 App. Div. 435; *Averell* v. *Williams*, 1 Dem. 501; *Welsh* v. *Cochran*, 63 N. Y. 181; *Turpin* v. *Comm.*, 140 Ky. 294; *Nader* v. *State*, 86 Tex. Cr. App. 424; *State* v. *Ward*, 61 Vt. 153; *Nalley* v. *State*, 28 Tex. Cr. App. 389; *Williams* v. *State*, 10 Okla. Cr. Rep. 348.)

*David F. Price* and *Leo Healy* for Fiore Grimaldi, appellant. The guilt of the defendant Fiore Grimaldi was not established beyond a reasonable doubt. (*People* v. *Ledwon*, 153 N. Y. 10; *People* v. *Cashin*, 259 N. Y. 434.) It was reversible error for the court to permit Pagano, to testify that he had been threatened by a person not shown to be in any way connected with appellant. (*People* v. *Buzzi*, 238 N. Y. 390; *People* v. *Zackowitz*, 254 N. Y. 192.) The court erred in permitting testimony that Pagano, when he was accused of receiving $900 to kill the deceased, stated that the Grimaldis were forcing Pignataro to make that statement. (*People* v. *Rutigliano*, 261 N. Y. 103; *People* v. *Dolce*, 261 N. Y. 108.)

*William F. X. Geoghan, District Attorney* (*Henry J. Walsh* of counsel), for respondent. The trial court committed no error in holding as a matter of law that Pignataro's final statement to the district attorney was a

voluntary confession. (*People* v. *Sangamino*, 258 N. Y. 85; *People* v. *Barbato*, 254 N. Y. 170; *People* v. *Weiner*, 248 N. Y. 118; *People* v. *Meyer*, 162 N. Y. 357; *People* v. *Zigouras*, 163 N. Y. 250.) The trial court committed no error in allowing in evidence Pagano's charge that Pignataro in accusing him of having received money from Pignataro to kill his wife was inspired by the Grimaldis. (*People* v. *Rodawald*, 177 N. Y. 408.)

O'BRIEN, J. About nine o'clock in the night of October 10, 1932, at Twelfth avenue and Eighty-third street, Brooklyn, two unknown men were seen to run away from an abandoned car. In it the police discovered the dead body of Gemma Pignataro with twenty wounds inflicted by a knife. Fiore Pignataro, husband of the slain woman, Frank Zock, Michael Rybka, Edward Grimaldi and Fiore Grimaldi were tried for murder in the first degree. Zock and Rybka were acquitted but the others were convicted and their appeals are now here.

Joseph Pagano, brother of the owner of the car, appeared as the chief witness for the prosecution. The jury was instructed that it could find him to be an accomplice. Following a series of assertions, denials, contradictions and protestations of ignorance, he eventually testified that Zock, Rybka and the brothers Grimaldi participated in the homicide to an extent which would constitute all of them principals. He did not implicate Pignataro. His identification of Zock and Rybka, two Polish youths, was as positive as his designation of the Grimaldis, who are Italians. If his ultimate recital rested upon veracity, all four are guilty. He committed perjury of the most flagrant nature and admitted that fact. This is his version: Pignataro's wife, whom Pagano's family had known for fifteen years, was accustomed to visit the Pagano home to give treatment to a child who was ill. On the evening of October 10th Pagano called for her at her home, drove her in his brother's car to his own house where she ministered to the child and about eight o'clock

he started from Forty-second street, where he lived, to drive her to her home at Third avenue and Fifty-seventh street. On the return at Second avenue and Forty-sixth street, a car in which four men were seated crowded his car against the curb and two of them with pistols emerged and forced him out of his car into the other. These two men entered the vehicle which they had compelled him to vacate and with Mrs. Pignataro drove away. The other two men, threatening to kill him if he sounded an alarm, drove him to Second avenue and Fifty-eighth street where they let him out of the car. From that point he walked home where he arrived about eight-thirty o'clock and before nine o'clock went to bed. On his way home he met and spoke to Mrs. Pignataro's young son but made no reference to the kidnapping and on his arrival at home told his wife nothing about it. The Pignataro boy testified that when Pagano spoke to him he was covered with blood and that he explained his condition by stating that there was something the matter with the car. The jury, however, was not bound to credit this testimony. When the police, accompanied by Pignataro, visited Pagano's home before ten o'clock that night, Pagano, knowing the statement to be false, informed them that his brother's automobile was in the garage. At the police station that night he stated that Mrs. Pignataro had gone home by trolley car and he detailed conflicting versions of her disappearance. At nine o'clock the next morning, admitting that he had told different stories and that after thinking over the matters he wanted to be truthful, he was examined by an assistant district attorney and the questions and answers were reported by a stenographer. When asked if he recognized any of the occupants of the car he replied that he did not know them by name but could identify them. He was certain that he did not know their names. All four appeared to him to be Italians and he thought that they might be acquainted with the Grimaldi brothers. He did not at that time

say that the Grimaldis were among those in the car. Later at police headquarters he was shown some photographs and he then stated that he knew Fiore Grimaldi. At the same time he denied recognizing Edward, whereupon, so he testified, the police told him: " Well, you better know him when we get back to Brooklyn." Before the grand jury he testified that Fiore Grimaldi and Rybka were the men who drove away with Mrs. Pignataro and that Edward Grimaldi and Zock were his captors who took him to Fifty-seventh street. At the trial the District Attorney, relying upon his testimony before the grand jury and his statements to the police and the Assistant District Attorney, called him as his principal witness. On direct examination, in downright fashion he brazenly repudiated his former statements and testimony. He swore that he did not know who any of the four men were and denied that he ever knew or saw Zock, Rybka or Edward Grimaldi prior to their arrest and that he had ever told the police the names of these men. He admitted that he knew Fiore Grimaldi whom, as he testified, he had once met at Pignataro's house, but denied that Fiore Grimaldi was one of the four men who had waylaid him and Mrs. Pignataro. He boldly proclaimed that his testimony before the grand jury was a lie. At the close of his testimony the court committed him as a material witness. Several days later he was recalled and testified positively that it was Fiore Grimaldi and Rybka who drove Mrs. Pignataro away, that the men who kidnapped him were Edward Grimaldi and Zock, that his testimony before the grand jury was true and his former evidence on the trial was perjury.

The evidence given by Pagano against the two Grimaldis was no stronger than his testimony against Zock and Rybka. Without his testimony none of the four could have properly been convicted. If his version is true, all four participated in the crime. He identified each with the same appearance of certainty but the jury

accepted his story that Fiore Grimaldi was present and acquitted Rybka. The verdict importing the jury's belief in the presence of Edward Grimaldi and the absence of Zock is equally inconsistent. Such a verdict based upon the varying testimony of a confessed perjurer ought not to be allowed to stand. The correctness of the result is certainly not free from reasonable doubt. (*People* v. *Ledwon*, 153 N. Y. 10; *People* v. *Munroe*, 190 N. Y. 435; *People* v. *Montesanto*, 236 N. Y. 396.)

The jury may have decided that Pagano was an accomplice. The evidence could justify such a finding. Aside from Pagano's testimony there was no evidence tending to connect Edward Grimaldi with the crime, unless the jury rejected the evidence produced by Edward relating to his presence in another part of Brooklyn at the hour of the commission of the crime. He accounted satisfactorily for his association with a girl in Third street at nine-thirty o'clock or shortly thereafter and endeavored to prove that he was with her all the evening after seven-thirty, but the jury could have refused to give credence to the witnesses who sought to prove that fact. As in the case of Edward Grimaldi, Zock and Rybka, the defense of Fiore Grimaldi was an alibi. Strong evidence, which is not incredible on its face, was produced tending to show that at nine-fifteen o'clock on the night of the murder, Fiore Grimaldi was present in St. Edwards street at a club of which he was a member. Conceivably the two Grimaldis might have been enabled to reach these points respectively at nine-fifteen and nine-thirty o'clock after the time when Edward left Pagano at Fifty-seventh street, if he did, and the time when Fiore left the abandoned car, if he did, at Twelfth avenue and Eighty-third street, but a defendant is not obliged to prove the impossibility of the commission of a crime by him. (*People* v. *Barbato*, 254 N. Y. 170.) An attempt to establish a false alibi may under proper circumstances constitute some corroboration of an accomplice (*People* v. *Deitsch*, 237 N. Y. 300), but corroboration must always be sup-

plemental to testimony which a jury could accept as true beyond a reasonable doubt. Corroboration is something collateral. Were there no evidence in the case tending to connect Edward Grimaldi with the crime except the fact, if it be a fact, that he falsely attempted to prove his presence at the time of the commission of the crime at a location remote from the scene of the crime, then as matter of law the jury would have nothing to consider. When Pagano finally decided to swear positively that Zock and Edward Grimaldi were the two individuals who kidnapped him and when the jury cast aside his testimony relating to Zock, it could not accept as true beyond a reasonable doubt his tale concerning Edward Grimaldi. Perhaps, in an effort to support this conviction at any cost, an argument might be formulated in the direction of a theory that the jury did in fact believe that Zock was present but that the evidence of the accomplice on that point was not corroborated. But in such an argument conflicting elements are involved. If Zock's attempt to prove an alibi was accepted as true, then Pagano either was hopelessly ignorant or deliberately lied about Zock, and his state of mind concerning Edward Grimaldi would, in all probability, be no more accurate or truthful. If the jury rejected Zock's attempt at an alibi, then Pagano's testimony, assuming it to have been accepted, might be held to be corroborated. So on any aspect, the evidence which acquitted Zock is not strong enough to convict Edward Grimaldi.

The evidence against Fiore Grimaldi, not considered as corroboration of a discredited accomplice but by way of an admission, is probably not so weak. The jury could have believed that his attempted establishment of an alibi was false. This fact, taken with his omission to testify, would arouse suspicion in the minds of a jury but would not constitute strong proof of a competent nature against a man like him of previous criminal record who was accused of murder. He is of the type whose

guilt is promptly conjectured and whose innocence, if such were necessary, would not readily be proved. The natural suspicion attaching to him was aggravated by his statement in the police station that several months before the murder he had, for pay, promised Pignataro to procure " a couple of gunmen " to go to Catskill, where Mrs. Pignataro then was, for the purpose of " bumping her off." Distrust in his guiltlessness of this specific crime lingers even when that statement was accompanied by his assertion that he never kept his promise, did not engage any gunmen and thus obtained money from the husband under false pretenses. Yet no bloodstains were found on his person or clothing and the fingerprints discovered on the knife and the car were not those of Fiore Grimaldi or Rybka, the two men who, according to Pagano's final testimony, occupied the car with the victim.

Two errors of law in the admission of evidence were, in view of the doubtful quality of evidence against them, highly prejudicial to the rights of both Grimaldis. Detectives were allowed to testify that at the station house on the evening of October 12th, in the presence of Pagano and the two Grimaldis who were then in custody, Pignataro stated that he had paid $900 to Pagano to put his wife out of the way, that Pagano in denying the charge, retorted that " the Grimaldis are making him say this," and that, during this exchange of charges, both Grimaldis remained silent. Under the rule as announced many years ago in *Kelley* v. *People* (55 N. Y. 565), the admission of this evidence would not constitute error, but by our recent decisions in *People* v. *Rutigliano* (261 N. Y. 103) and *People* v. *Dolce* (261 N. Y. 108) the doctrine of the *Kelley* case has been overruled. The principle as now established in this State is to the effect that a person in custody accused of a crime is under no duty to speak and that his silence should not be counted as giving assent. The second error crept into the case during

Pagano's explanation of his change of attitude as a witness on the trial. He asserted that he had lied when he swore that these defendants were not the four men who participated in the kidnapping of himself and Mrs. Pignataro and declared that his perjury arose from fear produced by threats made by Frank Grimaldi, a brother of Edward and Fiore. In *People* v. *Buzzi* (238 N. Y. 390, 397, 398) testimony was admitted which showed an effort on the part of defendant's sister and a detective employed by her attorney to suppress harmful evidence. Reversal of the judgment of conviction was based in part upon the holding by this court that such evidence is inadmissible unless defendant knew of and authorized the attempts at suppression. In the absence of such knowledge, efforts by friends to suppress evidence has no tendency to justify an inference of consciousness of guilt by defendant.

By the doubtful testimony of a witness of such low moral fibre as Pagano, uncertainty concerning the guilt of the Grimaldis is produced to such an extent as to render substantial and reversible an error of law which, under other circumstances, might be regarded as harmless.

Suspicion of Pignataro as an actor in this tragedy is so profound that a jury instinctively would be impelled to convict. If the sense of summary justice of a frontier vigilance committee were to prevail, affirmance of his conviction would almost inevitably follow. Perhaps the evidence would satisfy a court martial in the field. In a civil action with rulings free from error, an appellate court might hesitate to reverse as against the weight of evidence, but from an examination of the many complex features of this case in the light of the law which we are bound to administer, even for the benefit of one against whom the darkest misgivings arise, the conclusion cannot be avoided that all reasonable doubt, even in respect to Pignataro, has not been excluded and that the case was not tried without some error of law which we can

say was not prejudicial to his substantial rights.  Only the salient features have been outlined in this opinion, but the serious study which we have given to the endless details persuades us that much of the truth has not yet been discovered.  These three appellants are criminals or associates of criminals, their veracity may reasonably be doubted even when they make admissions apparently against their own interest, the chief witness whom the District Attorney was constrained to use for lack of a better one is an atrocious perjurer and perhaps a participant in this murder.  Currents and cross-currents springing from acts of bootleggers, strong arm men and a suspected adulteress flow through the case.  So many of the witnesses have lied either through hope of preserving their own liberty or of favoring their friends or of placating their enemies, that a true dissection of motives is prevented and a clear vision of acts is obscured.  The trial consumed several weeks and in such a maze of ramifications consisting of contradictory words and acts which grew out of motives not always apparent to the normal being, some error of law prejudicially affecting Pignataro's substantial rights not unnaturally occurred.

In respect to Pignataro, the theory of the prosecution is that he sought revenge against his wife, that his state of mind was engendered by a belief in her marital infidelity and that he employed some one to satisfy his vengeful sense of the wrong which he thought she had inflicted upon him.  A detective testified that on the night of the homicide Pignataro, then in the police station house, informed him that his wife had a lover whose name resembled " Alfred Ishkar," that she had bought clothes and an automobile for this man and that she had given to him most of the money which Pignataro had made during the last three or four years.  Not one of these assertions, however, was otherwise proved.  At that time Pignataro denied any knowledge concerning the perpetrators of the crime.  The same detective testified that

at six o'clock in the evening of October 12th, two days after the murder, Pignataro, still in custody in the station house, orally stated to him and another detective that he had paid $900 to Pagano to put his wife out of the way. Three statements by Pignataro were taken by stenographers. His first written statement made to an Assistant District Attorney was late in the night of the 11th, or early in the morning of the 12th. Therein he admitted that during the previous summer he had paid $200 to Fiore Grimaldi for the services of a lawyer in defending two men who, as Grimaldi had represented to Pignataro, were arrested near Newburgh in possession of a stolen car. He denied in this statement that the money was paid for the purpose of " putting his wife on the spot " and asserted that he did not tell these men to kill her or to shoot her. His second statement was made to the same Assistant District Attorney shortly after noon on October 12th. At this time he stated that he wanted a lawyer, again admitted that he had given Fiore Grimaldi $200 during the summer and also $400 in May when he, Pignataro, had been " pinched for a gun," but denied, as formerly, that he had hired any one to kill his wife, that he knew who did it or anything about it. The third written statement was made at one o'clock in the morning of October 13th. It was prior to this time that Pignataro had stated that he wanted a lawyer. He had also asked a detective if he could get a manslaughter plea for him. The detective replied that he would try to do so and would speak to the District Attorney about it, if Pignataro would tell the truth. Upon the detective's statement that in the event of conviction for manslaughter the term of imprisonment might be seven and a half to fifteen years, Pignataro replied that he would tell the truth. Here is his final statement in full: " Q. Fiori, your name is Fiori Pignatari? A. Yes. Q. You had a wife by the name of — A. Gemma. Q. And recently you paid $900 to get rid of her? A. Yes, sir. Q. You did pay $900 to get rid of her? A. Yes,

sir.  Q. Now, the reason you are telling me you paid the $900 is because you think somebody ratted on you?  A. No, sir.  Q. What reason have you for telling me this story about paying $900?  Do you want to tell the truth?  Is that the reason?  A. The reason I was — Q. Answer yes or no.  A. Yes.  Q. Did you pay $900 to get rid of Gemma?  A. Yes, sir.  Q. I would like to know the reason you are telling me?  A. Because I want to tell the truth.  Q. You are sure there is nobody influencing you, in other words nobody making you tell the story?  A. No, I am telling of my own will.  Q. This payment of $900 was made when?  A. Well, maybe — Q. Labor Day?  A. Maybe around on the 8th, maybe Thursday."

The court charged that this confession was voluntary as matter of law.  We think that error was thereby committed.  The jury is the final arbiter of every question of fact (*People* v. *Walker*, 198 N. Y. 329) and the issue whether an act is voluntary or involuntary is one of fact.  (*People* v. *White*, 176 N. Y. 331.)  It is true that section 395 of the Code of Criminal Procedure does not render this confession inadmissible.  There is no evidence that it was made under the influence of fear produced by threats nor upon a stipulation of the district attorney that this defendant should not be prosecuted.  No claim is made that he was beaten by the police.  After the confession was properly admitted in evidence, the circumstances under which it was made and the motives which prompted it were to be considered by the jury in estimating its weight and value.  The word " voluntary " is frequently used in judicial opinions in reference to admissibility under section 395 (*People* v. *Doran*, 246 N. Y. 409; *People* v. *Weiner*, 248 N. Y. 118; *People* v. *Barbato*, 254 N. Y. 170; *People* v. *Alex*, 260 N. Y. 425), but its primary meaning imports a condition of mind which is free and unconstrained.  This man had been in custody from ten o'clock in the night of October 10th

until the confession was finally drawn from him at one o'clock in the morning of October 13th. He had had little sleep and not much to eat. He asserted that his sole purpose was to tell the truth. The jury had the right to consider the question whether this statement was voluntary in the sense that the defendant was uncontrolled by fear or inspired by a false hope. Was his mind free to act? Did he constitute himself a shining advocate of verity and intend to free his conscience of an oppressive burden or, knowing himself to be innocent of this particular offense but also to belong to the fellowship of criminals and under grave suspicion as the instigator of this tragedy, was he coerced by terror of the consequences of a denial which might lead to his conviction of a crime of which he was not guilty? Was he ensnared in the intrigues, feuds and vendettas growing out of the illicit loves and other misdeeds rife among these defendants and their associates in such measure that he was impelled to prefer the safety of a prison to a freedom imperilled by their vengeance? These are questions of fact which, even after the admission of the confession in evidence, the jury could ask themselves before they were bound to decide that the confession was voluntary. (See *People* v. *Rogers,* 192 N. Y. 331, 345.) The omission of the questioner to inquire the identity of the person employed to do the murder creates bewilderment. Pignataro's oral statement is to the effect that Pagano is the assassin whom he hired. In the written confession the obvious question does not appear. The brief of the District Attorney admits with commendable frankness that this is a mysterious murder. Surely the mystery is not dispelled by the meagre admissions made by Pignataro.

All or some of these appellants may be guilty but, after a minute examination of the record, we have come to the conclusion that this is a case where we ought to exercise the power conferred by section 528 of the Code of

Criminal Procedure and grant a new trial on the ground that justice requires it. (*People* v. *Spickler*, 255 N. Y. 408; *People* v. *Cashin*, 259 N. Y. 434.)

The judgments of conviction should be reversed and a new trial ordered.

KELLOGG and HUBBS, JJ., concur with O'BRIEN, J.; LEHMAN and CROUCH, JJ., concur in result; POUND, Ch. J., and CRANE, J., dissent and vote for affirmance.

Judgments reversed, etc.