UNITED STATES of America ex rel. Christopher ROMANO, Petitioner-Appellee,

v.

Hon. Edward M. FAY, as Warden of Green Haven Prison, Stormville, New York, Respondent-Appellant.

No. 145, Docket 29947.

United States Court of Appeals Second Circuit.

Argued Nov. 17, 1965.

Decided April 29, 1966.

acquire the Church Rock properties in which he at no time asserted he had a personal interest.

Joshua N. Koplovitz, New York City (Anthony F. Marra, New York City, on the brief), for petitioner-appellee.

Barry Mahoney, Asst. Atty. Gen., New York City (Louis J. Lefkowitz, Atty. Gen. of New York, Samuel A. Hirshowitz, First Asst. Atty. Gen., New York City, on the brief), for respondent-appellant.

Before LUMBARD, Chief Judge, and MEDINA and WATERMAN, Circuit Judges.

LUMBARD, Chief Judge.

The principal question for decision is whether the use of Christopher Romano's post-indictment statements made to a police officer and to an assistant district attorney so infected his 1953 New York trial and conviction with federal constitutional error that habeas corpus relief is warranted. The District Court for the Southern District of New York, Murphy, J., granted the writ and directed Romano's discharge or a prompt retrial. We reverse and remand with instructions to dismiss Romano's petition. We hold that the only infirmity in Romano's questioning and subsequent trial was an inconsistency with two Supreme Court decisions handed down more than ten years later, Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), and Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), and that those decisions should not be retrospectively applied to void Romano's conviction.

On January 28, 1950, Mrs. Margaret Hughes reported to New York City police that she had been beaten and raped the previous night at her home by a knife-wielding intruder known to her as "Chris." The description of this assailant given by Mrs. Hughes and by Eunice Lawlor, a sixteen-year-old baby sitter present during the alleged rape, led the investigating officers to suspect Romano, whom they had known previously. In the course of a fruitless three-day search for Romano, the police learned that he had left for Michigan. On February 10, 1950, an indictment was returned charging him with assault and rape.

In Michigan, Romano was convicted of larceny in May of 1950 and spent until March 1953 in a Michigan prison. Upon his release, Romano was brought by train back to New York and tried under both counts of the February 1950 indictment. He was convicted of first degree rape and second degree assault and given a ten to twenty-year sentence as a multiple felon on September 22, 1953.

At the trial, Mrs. Hughes described the circumstances surrounding the alleged rape, but she failed to identify Romano, who had lost considerable weight while in Michigan. However, eye-witness Eunice Lawlor corroborated Mrs. Hughes' testimony and made a positive identification. The prosecution then called Detective John A. Tracy, one of the officers who had brought Romano from Michigan to New York. Tracy testified, without objection, to a conversation with Romano during the train ride. He stated that, in response to questions "pertaining to the incident, the complaint of 1950," Romano had replied, "Can you rape a prostitute?" and then had asked "whether or not the withholding of the two dollar payment could be considered a rape." Upon cross-examination, Detective Tracy conceded that "at no time did Romano ever admit he raped Mrs. Hughes."

The prosecution's final witness was Barney Moss, a stenographer who read before the jury a statement made by Romano in response to questioning by

Assistant District Attorney Lawrence J. Peltin after Romano arrived in New York from Michigan.[1] In this statement, Romano had admitted his presence in Mrs. Hughes' room on the night in question but had denied committing the rape and had refused to answer questions concerning the details of his encounter with Mrs. Hughes.

The defense consisted solely of Romano's own protracted testimony. He described in detail his version of the events on January 27 and 28, 1950. He admitted his presence in Mrs. Hughes' apartment on that night, but he denied that they had had intercourse or that he had beaten her other than in self-defense. On cross-examination, he admitted making the statements attributed to him by Detective Tracy, but he contended that he and Tracy had not been discussing Mrs. Hughes' case at that time.

■ The prosecutor also attempted to use Romano's statement to Peltin for impeachment purposes on cross-examination by asking Romano why he had refused to answer Peltin's questions and yet had told the jury an exculpatory version of the events in question.[2] Romano replied: "When I got questioned by Mr. Peltin I asked for my lawyer to be present, and he did not want my lawyer to be present. So, during the course of them questions I was saying, 'No,' to every question that I thought shouldn't be answered at that time." Romano also explained that he had said nothing inculpatory to Peltin. "I admitted I was in the room. I didn't admit anything else, or say anything, yes or no, there, to them questions."

■ In this petition for habeas corpus relief, Romano alleges that his post-indictment statements to Tracy and Peltin were involuntary and that they were taken in violation of his Sixth Amendment right to counsel. There can be little doubt that the claim of involuntariness, under any standard, is frivolous. At trial, Romano admitted that he made the statements and that they were substantially true as related to the jury. No circumstances in any way supporting an inference of coercion were shown, and indeed Romano's counsel conceded the voluntariness of these statements during oral argument to this court.

As Romano at all times stoutly denied that he had committed the rape and assault for which he was convicted, we are dealing here not with confessions in the common sense but rather with arguably inculpatory comments and references to the circumstances surrounding the crime. According to the district court, the only infirmity in the conviction which it set aside lies in its determination that, had this criminal trial occurred after Massiah v. United States and Escobedo v. State of Illinois, these statements, if objected to, would have been excluded.[3] As those decisions were handed down more than ten years after Romano's trial, there is squarely presented the question whether they should be given retroactive application under the integrated stand-

---

1. The statement was read "for identification" without objection, but it was not introduced into evidence, presumably because it contained inadmissible references to Romano's prior criminal record (which were not read by Moss). The entire statement as read appears in the appendix to this opinion.

2. Romano did not object to this comment on his refusal to answer pretrial questioning even though such comment has constituted reversible error in New York for many years. See People v. Abel, 298 N.Y. 333, 83 N.E.2d 542 (1949); People v. Pignataro, 263 N.Y. 229, 188 N.E. 720 (1934). Even assuming that such comment violates the Fifth Amendment's privilege against self-incrimination under the doctrine of Griffin v. State of California, 380 U.S. 609, 85 S.Ct. 1229, 14 L. Ed.2d 106 (1965), this doctrine is not given retroactive effect. Tehan v. United States ex rel. Shott, 382 U.S. 406, 86 S. Ct. 459, 15 L.Ed.2d 453 (Jan. 19, 1966).

3. The State urges that Judge Murphy erred in holding that the questioning of Romano violated the standards set forth in Escobedo and Massiah. While it is certainly very doubtful that Romano's post-indictment statements would be admissible had his trial occurred after Massiah, we do not decide this question because, as we explain below, we hold Massiah nonretroactive.

ards evolved by the Supreme Court in Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), and described in detail in Tehan v. United States ex rel. Shott, 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453 (Jan. 19, 1966).

## I. EXHAUSTION OF STATE REMEDIES

■ A threshold question in any federal habeas corpus case is whether the petitioner has exhausted his state remedies. There is no point in recounting Romano's many applications for state and federal post-conviction relief prior to the instant petition. Suffice it to say that we agree with Judge Murphy that Romano's most recent unsuccessful application to the New York courts for *coram nobis* relief raised substantially the same issues that are presented here. See 21 App.Div.2d 754, 251 N.Y.S.2d 909, leave to appeal denied, Ct.App., July 13, 1964.

■ The exhaustion requirement is therefore satisfied, see, e. g., Brown v. Allen, 344 U.S. 443, 502, 73 S.Ct. 397, 97 L.Ed. 469 (1953), unless, as the State urges, Romano should be compelled to pursue New York's new post-conviction procedure for testing the voluntariness of confessions, see People v. Huntley, 15 N.Y.2d 72, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965), as we held in United States ex rel. Martin v. McMann, 348 F.2d 896 (1965). Judge Murphy rejected this contention because he found the allegations of involuntariness conclusory.

■ Despite our conclusion that Romano's involuntariness claim is frivolous and that his hope for relief lies in his Sixth Amendment contentions, we would be strongly disposed to remand his petition for a *Huntley* hearing as a matter of comity, see United States ex rel. Martin v. McMann, supra, except for two factors: first, it is now clear that New York would deny *coram nobis* relief for Ro-

mano's right to counsel claims because he raised no proper objection at trial, People v. Dash, 16 N.Y.2d 493, 260 N.Y. S.2d 437, 208 N.E.2d 171 (1965), approving People v. Howard, 12 N.Y.2d 65, 236 N.Y.S. 39, 187 N.E.2d 113 (1962); [4] and second, we find no unresolved factual questions related to the Sixth Amendment claims raised here that would be developed at a *Huntley* hearing. Thus, we conclude that Romano has adequately exhausted his state remedies.

## II. THE RETROACTIVITY QUESTION

Petitioner argues that the Supreme Court's decision in Lyles v. Beto, 379 U.S. 648, 85 S.Ct. 613, 13 L.Ed.2d 552 (1965), precludes this court from holding that *Massiah* is not retroactive. The Court in *Lyles* remanded to the Fifth Circuit "for reconsideration in light of Massiah v. United States" a habeas corpus petition involving a pre-*Massiah* conviction. But we do not think that the Supreme Court meant to foreclose "consideration" of the retroactivity question. This seems abundantly clear from the Court's grant of certiorari in Johnson v. New Jersey, 382 U.S. 925, 86 S.Ct. 318, 15 L.Ed.2d 339 (Nov. 23, 1965), a case presently under consideration in which retroactivity is the principal issue.

In Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), the Supreme Court held that the exclusionary rule of Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), would not be applied retroactively, as this court had held in United States ex rel. Angelet v. Fay, 333 F.2d 12 (1964), aff'd, 381 U.S. 654, 85 S.Ct. 1750, 14 L.Ed.2d 623 (1965). Subsequent to oral argument in this case, the Court held that the doctrine of Griffin v. State of California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), which bars adverse comment by the prosecutor or trial judge on a defendant's failure to testify, also

---

4. On the other hand, a failure to object will not preclude federal habeas corpus relief provided petitioner's trial preceded *Escobedo* and *Massiah*. United States v. Drummond, 354 F.2d 132, 140 (2 Cir.

1965). The *Howard* decision has the effect of making New York's right to counsel doctrines for the most part nonretroactive.

would not be given retroactive [5] effect. Tehan v. United States ex rel. Shott, supra.

In its *Linkletter* and *Tehan* decisions, the Court emphasized that the retroactivity of a particular rule or decision is to be decided by "weigh[ing] the merits and demerits in each case by looking to the prior history of the rule in question, its purposes and effect, and whether retrospective operation will further or retard its operation." Linkletter v. Walker, 381 U.S. at 629, 85 S.Ct. at 1738. In determining the retroactivity of a specific constitutional doctrine affecting the administration of criminal justice, the inquiry must be directed at the purposes of the new doctrine, the reliance placed by law enforcement officials on previous law, and the effect on the administration of justice of retroactive application. Id. at 636, 85 S.Ct. 1731. Thus, every element bearing on the three-fold inquiry is to be carefully evaluated.

A. *The Purposes Behind* Escobedo *and* Massiah

In our opinion, the most important factor in our decision is an assessment of the purposes of the *Escobedo* and *Massiah* [6] doctrines and the effect of retroactive application upon the achievement of those purposes. In assessing the "complex of values" underlying these decisions, the inquiry must be focused on whether the new doctrine was aimed at correcting influences that "infect a criminal proceeding with the clear danger of convicting the innocent." Tehan v. United States ex rel. Shott, 382 U.S. 406, 86 S.C. 459. As Mr. Justice Clark pointed out, "in each of the three areas in which we have applied our rule retrospectively the principle that we applied went to the fairness of the trial—the very integrity of the fact-finding process." Linkletter v. Walker, 381 U.S. at 639, 85 S.Ct. at 1743. See also United States ex rel. Durocher v. LaVallee, 330 F.2d 303, 310 n. 3 (2 Cir.) cert. denied, 377 U.S. 998, 84 S.Ct. 1921, 12 L.Ed.2d 1048 (1964); Mishkin, supra note 5, at 79–86.

There can be little doubt that the doctrine excluding involuntary confessions and admissions bears a clear relationship to the integrity of the fact-finding process. Although a confession, like any statement against interest, is normally a most reliable form of evidence, see United States v. Cone, 354 F.2d 119, 126 n. 19 (2 Cir. 1965), it is of doubtful reliability when the defendant was physically or psychologically coerced into making it. Consequently, as the Supreme Court stated in both *Linkletter* and *Tehan*, the rule excluding involuntary statements is given retroactive ap-

5. We are of course dealing with the "impure" definition of retroactivity adopted by the Court in *Linkletter* and *Tehan*, namely, whether the constitutional doctrine at issue "applies to state court convictions which had become final before rendition of our opinion." 381 U.S. at 622, 85 S.Ct. at 1734. The question really involves, therefore, the scope of federal habeas corpus relief, and it has been suggested that the problem be analyzed in those terms. Mishkin, The Supreme Court 1964 Term, The High Court, The Great Writ, and the Due Process of Time and Law, 79 Harv.L.Rev. 56 (1965). However, the Supreme Court has not adopted this approach. Tehan v. United States ex rel. Shott, 382 U.S. 406, 86 S. Ct. 459 at 462.

6. Of course, a difficulty that plagues us throughout this opinion is the present uncertainty with respect to the ultimate scope to be given the *Escobedo* decision. Compare United States v. Cone, 354 F.2d 119 (2 Cir. 1965), with United States ex rel. Russo v. State of New Jersey, 351 F. 2d 429 (3 Cir. 1965). Fortunately, this uncertainty has little effect on this case. Romano's statements were made after indictment, and we find the right to counsel doctrine more clearly delimited in *Massiah* than in *Escobedo*. Indeed, the doctrine with respect to post-indictment interrogation was explicitly forecast. See Spano v. People of State of New York, 360 U.S. 315, 324, 326, 79 S.Ct. 1202, 3 L. Ed.2d 1265 (1959) (concurring opinions). Our assumption is that the conduct here involved violated the *Massiah* right to counsel doctrine; to the extent that *Escobedo* proscribes similar conduct in the pre-indictment stages, our discussion is applicable to both cases.

plication. E. g., Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963).

On the other hand, the *Massiah* and *Escobedo* doctrines are not aimed at rendering confessions inadmissible because they are factually unreliable. Rather, those decisions operate to exclude "the use of evidence which is relevant, reliable and highly probative of * * * whether the accused committed the act with which he is charged." Massiah v. United States, 377 U.S. at 208, 84 S.Ct. at 1204 (Mr. Justice White, dissenting). It has been asserted that these decisions are in part aimed at finding a workable substitute for the difficult inquiry into involuntariness. However, such a substitution, which on its face looks primarily to the future, need not be applied retroactively when, given the previous broad concept of involuntariness, the new rule seems unlikely to result in any net increase in the reliability of the guilt-determining process. See Mishkin, supra note 5, at 83–86, 96–97. Moreover, even if *Escobedo* and *Massiah* are held nonretroactive, it will remain open to habeas corpus petitioners to allege and prove that their convictions were tainted by the use of involuntary and hence potentially unreliable confessions.

■ *Massiah* and *Escobedo* are constitutionally grounded on the Sixth Amendment's guarantee that an "accused shall enjoy the right * * * to have the Assistance of Counsel for his defense." When the right to counsel is denied during a judicial proceeding, there is a substantial danger that the guilt-determining process is thereby made less reliable. The marshalling and presentation of evidence, the cross-examination of witnesses, the summation to a jury all require the skills of a lawyer; when an untrained defendant must oppose alone the experienced presentation of a prosecutor acting as advocate, the balance is tipped sharply against the defense for reasons other than the truth of the prosecution's case. Thus, the salutary doctrine of Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), was given retroactive effect by this court

in United States ex rel. Durocher v. LaVallee, 330 F.2d 303 (2 Cir.), cert. denied, 377 U.S. 998, 84 S.Ct. 1921, 12 L.Ed.2d 1048 (1964). See also Doughty v. Maxwell, 376 U.S. 202, 84 S.Ct. 702, 11 L.Ed.2d 650 (1964).

But these same dangers are not present when the defendant is questioned by the police. To be sure, the defendant is often at a tactical disadvantage in the "battle of wits" between a skilled interrogator and one who attempts to obscure or conceal his guilt. But the confessions or admissions that are obtained through normal and noncoercive police questioning are not unreliable and the search for truth is not hampered by their admission during a trial at which the defendant is represented by counsel. Thus, we find the Sixth Amendment arguments for retroactive application of *Massiah* and *Escobedo* far weaker than the arguments which led us to apply *Gideon* retroactively.

■ In our opinion, the major underlying purposes of *Escobedo* and *Massiah* are not related to the integrity of the fact-finding process of a criminal prosecution. Rather, those decisions reflect current notions of the proper relationship between the accused and the prosecution, indeed, between the individual and the State. *Escobedo* and *Massiah* oppose the unrestricted use of even reliable confessions as an encroachment upon the privilege against self-incrimination, which many feel can only be effectively exercised at the pre-trial stage in the presence of a lawyer representing the accused; these decisions are an affirmation of the prosecution's moral duty to obtain convictions in contested cases by extrinsic evidence rather than by the words of the defendant.

In large part, therefore, *Escobedo* and *Massiah* seem designed to reduce the role that confessions play in securing convictions by altering the balance between appropriate and inappropriate police questioning. Although the ultimate scope of these decisions is as yet far from clear, if applicable to exclude statements such as those made in this case, we can only

conclude that their basic purposes, like the purposes behind the privilege against self-incrimination itself, "do not relate to protecting the innocent from conviction, but rather to preserving the integrity of a judicial system in which even the guilty are not to be convicted unless the prosecution 'shoulder the entire load.'" Tehan v. United States ex rel. Shott, 382 U.S. 406, 86 S.Ct. at 464.

**B.** *The Reliance Factor*

For many years prior and subsequent to Romano's conviction, the Supreme Court had consistently held that confessions and inculpatory statements could be properly admitted during State trials unless it was shown that they were involuntarily given. E. g., Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.E.2d 908 (1964); Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed. 2d 1037 (1961); Spano v. People of State of New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959); Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953); Gallegos v. State of Nebraska, 342 U.S. 55, 72 S.Ct. 141, 96 L.Ed. 86 (1951); Brown v. State of Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936). Although the standards⁻ with respect to when a statement was given in circumstances so coercive as to render it involuntary were stiffened during this period, voluntariness remained the sole constitutional criterion applied in State cases.

As the federal courts became more and more aware of the necessarily coercive effects of prolonged, secret interrogation, the presence or absence of counsel at an interrogation session became an increasingly significant factor in assessing voluntariness. Compare Haynes v. State of Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963), with Stroble v. State of California, 343 U.S. 181, 72 S.Ct. 599, 96 L.Ed. 872 (1952). However, prior to the prophylactic rule in *Massiah*, such absence alone, even in rather "distasteful" circumstances, was not enough to render any voluntary statements elicited constitutionally inadmissible. See Cicenia v. LaGay, 357 U.S. 504, 78 S.Ct. 1297, 2 L.Ed.2d 1523 (1958); Crooker v. State of California, 357 U.S. 443, 78 S.Ct. 1287, 2 L.Ed.2d 1448 (1958). There were of course proponents of a contrary rule during this period. But, unlike the case of illegally seized evidence presented in *Mapp*, it was not the majority view in 1953 that post-indictment questioning in the absence of counsel was contrary to modern concepts for fair treatment of those accused of crime.[7] Thus, as in *Tehan*, the reliance placed by law enforcement officials on Supreme Court decisions "was of unquestioned legitimacy as compared to the reliance of the States upon the doctrine of Wolf v. Colorado [338 U.S. 25, 65 S.Ct. 1359, 93 L.Ed. 1782], considered in Linkletter as an important factor militating against the retroactive application of Mapp." 382 U.S. 406, 86 S.Ct. at 466.

The effect of this reliance is graphically illustrated in this case. The State's case hinged upon whether Mrs. Hughes or Eunice Lawlor could identify Romano as the assailant; Eunice Lawlor's testimony was an insuperable blow to the defense.[8] Even assuming that Tracy and

7. As of 1953, it is clear that Romano's statements were admissible in New York and probable that the brief and noncoercive questioning by Peltin and Detective Tracy violated no New York law. See People v. Spano, 4 N.Y.2d 256, 173 N.Y. S.2d 793, 150 N.E.2d 226 (1958), rev'd, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959). Even before *Massiah*, New York changed its rule to render such statements inadmissible, see People v. DiBiasi, 7 N.Y.2d 544, 200 N.Y.S.2d 21, 166 N.E.2d 825 (1960), but this change is not "retroactive" to this case. See p. 1745 and note 4 supra.

8. During the hearing to determine Romano's sentence, the trial judge summed up his view of the evidence in this case: "There is very little need of my reciting the details of the particular crime involved here. As far as this particular case was concerned what impressed this Court most favorably and certainly led this Court to believe beyond a peradventure of a doubt of the guilt of this defendant was the testimony of the

Peltin would have obtained Romano's statements under the circumstances presented here had *Massiah* been the law in 1953, it is highly unlikely that the prosecution would have jeopardized so strong a case by offering potentially inadmissible evidence merely to impeach in a limited fashion Romano's own version of the facts. And, were the statements offered in evidence during the trial, the requirement of a timely objection would have enabled the trial judge to resolve the problem at that time.

### C. *The Effect of Retroactivity on the Administration of Justice*

The final factor to be considered is the effect upon the administration of criminal justice of a retrospective application of *Massiah* and *Escobedo*. Of course, retroactive application of any new doctrine that restricts the conduct of police or prosecutor is disruptive to a certain extent. Therefore, in our opinion, this factor must itself be weighed from a comparative standpoint.

In *Linkletter*, the Court found that the retroactive exclusion of illegally seized but wholly reliable tangible evidence "would tax the administration of justice to the utmost. Hearings would have to be held on the excludability of evidence long since destroyed, misplaced or deteriorated. If it is excluded, the witnesses available at the time of the original trial will not be available or if located their memory will be dimmed." 381 U.S. at 637, 85 S.Ct. at 1742. In *Tehan*, the Court found that only six States would be affected by retroactive application of Griffin v. State of California, but it noted that the effect in those States would be "grave indeed" because "it may fairly be assumed that there has been

comment in every single trial in the courts" of those States. 382 U.S. 406, 86 S.Ct. at 466. We think that the potential impact of a retroactive application of *Massiah* and *Escobedo* surpasses that of either Mapp v. Ohio or Griffin v. State of California for a number of reasons.

It has always been standard police procedure in all American jurisdictions to question those arrested for crime so as to gain additional information, especially as to others who may be involved, and to afford the suspect an opportunity to absolve himself or confess. The importance of a reasonable questioning period has often been recognized and, as the Supreme Court has said, "if it is once admitted that questioning of suspects is permissible, whatever reasonable means are needed to make the questioning effective must also be conceded to the police." Culombe v. Connecticut, 367 U.S. at 579, 81 S.Ct. at 1866. See United States v. Cone, supra. It is natural for conscientious law enforcement officers to question with as great frequency and under circumstances as conducive to success as they think possible under existing standards. The universal use of questioning at some early opportunity magnifies the consequences of retroactive application of a radically new restriction on interrogative techniques. Although it is impossible to ascertain the number of final convictions that would be disrupted by retroactive application of these decisions,[9] we think that a perusal of the habeas corpus petitions which inundate our court each year makes it clear that a "wholesale release of the guilty" might well result from such an application.

---

young lady who was an eye witness to the actual commission of the rape. The Court was greatly impressed with her credence, was impressed with her appearance and the Court feels that beyond any cavil the jury was certainly of the opinion that if anybody told the truth in this case that young lady did."

9. A supplementary memorandum submitted to the Supreme Court on behalf of the

States in Linkletter v. Walker and Angelet v. Fay, 381 U.S. 654, 85 S.Ct. 1750, 14 L.Ed.2d 623 (1965), showed that of the last 100 persons executed in New York prior to 1961, the statements of 85 had been introduced at trial. By contrast, tangible evidence seized by the police had been introduced in 76 of the cases. See also Mishkin, supra note 5, at 101.

Moreover, it should be remembered that Romano's case does not involve a confession, as did *Massiah* and *Escobedo*, but rather statements that proved somewhat inconsistent with the version of the circumstances surrounding the crime given by the defendant at the trial. Retroactive application will put in doubt every trial which involved any use of such statements. Thus, the disruption caused by such application is even further magnified. Given the difficulty of obtaining sufficient evidence at a retrial of those convicted long ago, we think retroactive exclusion of this type of statements would be an unwarranted burden on the judicial process.

The assessment of whether any new doctrine should be retroactively applied requires a nice balancing of many interrelated factors. Nevertheless, "the drawing of lines of distinction between different types of cases seems to us to be of the essence of the judicial process." United States ex rel. Angelet v. Fay, 333 F.2d at 21. We are not persuaded that the purposes of Massiah v. United States will be vindicated by a retroactive application of that decision to void Romano's conviction. And we find justifiable reliance on the part of New York's police, prosecution officials and courts in using Romano's wholly voluntary statements in securing his 1953 conviction. Mindful of the extraordinary strain on the administration of criminal justice that habeas corpus retroactivity of *Massiah* and *Escobedo* would cause, we can only conclude that such application would unnecessarily deter the further development of constitutional principles that reflect more enlightened concepts of the relationship between the accused and law enforcement officials throughout the various stages of the criminal prosecution. Upon consideration of all these factors, we hold that retroactive application of the *Massiah* and *Escobedo* doctrines to void Romano's conviction would not be appropriate.

The decision of the district court is reversed. The cause is remanded with instructions to dismiss Romano's petition for habeas corpus.

### APPENDIX

"Statement taken in the District Attorney's Office on March the 24th, 1953, at 1:30 P.M. Present were Detective James Holtz, Number 763 of the 48th Squad, Detective John Tracy, Number 892, of the 48th Squad, and Assistant District Attorney Lawrence J. Peltin, and myself, Barney Moss.

"*By Mr. Peltin:*

"Q. What is your name? A. Christopher Romano.

"Q. Where do you live? A. Well —

"Q. Where did you live in the year 1950? A. 1746 Bathgate Avenue.
"Q. With whom? A. My wife, daughter, my father and mother, and my sister.

"Q. What sort of work did you do in 1950? A. Unemployed at that time.

"Q. What sort of work did you ever do? A. Laborer.

"Q. How old are you now? A. Twenty-seven.

"Q. Did you know a girl named Margaret Hughes, also known as Margie Hughes? A. Yes.

"Q. When did you meet her? A. December, 1949, or January, 1950.

"Q. Did you leave the City of New York in 1950? A. That's right.

"Q. When did you leave the City of New York in 1950? A. I think it was—(Here the defendant reaches in his pocket. Continuing the answer)— Tuesday, January 31st.

"Q. How can you recall at this time that you left the City of New York on Tuesday, January 31st, 1950? A. I have got it marked right here on this calendar.

"Q. Why did you leave the City of New York on Tuesday, January 31st, 1950? A. I intended to make my residence in Michigan.

"Q. Did you go to Michigan? A. That's right.

"Q. Did you go alone or with your family? A. Went with my family.

"Q. Where did you go in Michigan? A. In Detroit."

The Court: Stop skip two questions, two answers and start with the question, "Did you work in Detroit, Michigan?

"Q. Did you work in Detroit, Michigan? A. That's right.

"Q. What sort of work? A. I worked at Ford's in the River Oak Plant in Dearborn, Michigan.

"Q. Why did you leave on January the 31st the City of New York? To establish residence in Michigan.

"Q. Why? To get a job in Michigan.

"Q. Did you have relatives in Michigan? A. No. I was in Michigan in 1949. I liked it to stay. I wanted to move my family to Michigan.

"Q. Did you move your wife and children to Michigan? A. No. I went there with my wife until I got a job."

The Court: Stop, skip two questions and two answers. Next question, "How long did you work—"

"Q. How long did you work in the State of Michigan. A. About seventeen days.

"Q. Who did you work for? A. Ford Motor Company.

"Q. You told me that you met Margie, or Margaret Hughes in either December, 1949 or January 1950, is that correct? A. That's correct.

"Q. How often did you see her during that time? A. Number of occasions.

"Q. What do you mean by a number of occasions? A. I seen her passing a bar.

"Q. Did you ever go out with her? A. Never went out with her.

"Q. Did you ever drink with her at a bar? A. Yes, I did.

"Q. On numerous occasions? A. No, just one occasion.

"Q. Where at? A. At the International Bar, 175th Street and Bathgate Avenue.

"Q. Did you ever go to her home at 487 East 175th Street? A. I did.

"Q. When? A. On January 28, 1950.

"Q. What time did you get there? A. Maybe somewhere between two and three o'clock.

"Q. In the afternoon or morning? A. Morning, the morning.

"Q. How did you happen to go to her home on January 28th, 1950, between two and three o'clock in the morning? A. A fellow by the name of Tommy told me to meet him there, there or the International Bar.

"Q. Before January 28th, 1950, had you ever been at Margie's home at 487 East 175th Street? A. No sir.

"Q. How do you know that she lived there? A. I was familiar with that building; it was pointed out to me by Tommy.

"Q. How did you know what room she lived? A. A fellow named Jimmie brought me to the apartment.

"Q. A fellow named Jimmie brought you to the apartment door? A. Yes.

"Q. What's Tommy's last name? A. I am not sure.

"Q. Where does he live? A. Your guess is as good as mine.

"Q. What is Jimmie's last name? A. I don't know either.

"Q. Where does he live? A. He lives in a furnished room.

"Q. Where? A. At that address.

"Q. 487 East 175th Street? A. That's right.

"Q. Now, tell me what happened on January 28, 1950, between two and three o'clock in the morning, when you went to the furnished room of Margaret Hughes. A. That's where I am going to stop 'til I get my lawyer. From there, you have to tell me.

"Q. In other words, you refuse to answer as to what, if anything, you

did in said furnished room? A. I haven't been identified by the woman, I haven't been arraigned on any case. I don't see any reason why I should say anything.

"Q. Did you, on January 28, 1950, sometime at about three-thirty in the morning, enter Margaret Hughes' room, punch her in the face and body with your clenched fists, produce a penknife and cut her under the left breast and on the right index finger? You can answer or refuse to answer, if you so desire. A. Is that statement finished by you?

"Q. I am asking you about that. A. That's an incomplete statement.

"Q. I am asking you if you punched her, struck her about the face and body with your clenched fist? A. It's incomplete. I can't answer that.

"Q. Did you produce a pen knife and cut Margie Hughes under the left breast and on the right index finger? A. No.

"Q. Did you have a pen knife with you at the time you entered her furnished room? A. Yes.

"Q. What did you do with the pen knife? A. I recall I left it up my house.

"Q. What did you do with the knife in Margie Hughes' room? A. Nothing.

"Q. Why did you carry the knife with you to her room? A. It didn't belong to me; I was holding it for someone.

"Q. Who did the pen knife belong to? A. Eddie Albert.

"Q. Where does he live? A. 1746 Bathgate Avenue.

"Q. Did you punch Margie Hughes with your clenched fists in her apartment that morning on that day? A. I ain't saying nothing to that.

"Q. Did you force Margie Hughes to lie on the bed near the wall of her room and then forcibly have sexual intercourse with her against her will, by the use of force? A. No.

"Q. Did you have intercourse with her that morning at all. A. I am not answering that question.

"Q. Why did you go to her room that morning between two and three o'clock in the morning? A. Fellow by the name of Tommy requested I meet him there or the International Bar.

"Q. Did you ask Tommy why you should meet him in this woman's apartment? Between two and three in the morning? A. Because he said that was his girl friend.

"Q. What was the purpose of your going to this apartment between two and three in the morning? A. Well, I was supposed to help him, but to get his clothes out of his wife's apartment.

"Q. His wife's apartment? A. That's right.

"Q. Is Margie Hughes his wife? A. He had a wife and two kids. I couldn't get up there to get his clothes.

"Q. Where? A. Up his house where his wife and two kids live.

"Q. What has that got to do with Margie Hughes' furnished room? A. I was supposed to meet him there or the International. I was supposed to go to his house.

"Q. Did you enter Margie Hughes' furnished room? A. I did.

"Q. Did you see three children in the room? A. I think it was three.

"Q. Did you see another young girl about nineteen or twenty years old in the room outside of Margie Hughes? A. I did.

"Q. Did you know who that other girl was? A. I don't.

"Q. What did you do while in the room? A. I am not going to answer that.

"Q. What did you do, if anything, after you entered the room? A. I am not going to answer that.

"Q. Did you see Margie Hughes in the room? A. Yes; she was in the room.

"Q. Did you talk to her? A. I talked to her.

"Q. What did you say to her. A. Discussing about her husband being in Elmira Reformatory.

"Q. Did you know her husband? A. That's what the discussion was about, whether I knew him or not.

"Q. After the discussion, what did you do, if anything, to Margie Hughes? A. Nothing.

"Q. Did you assault her or hit her with your fists? A. I am not answering that.

"Q. Did you strike her with a penknife and cut her. A. No.

"Q. Under the breast? A. No.

"Q. Did you use your pen knife against Margie Hughes that morning in her room? A. No.

"Q. Didn't you forcibly have intercourse with her? A. No.

"Q. Did you have intercourse with her at all? A. I am not answering that question.

"Q. You say you didn't forcibly have intercourse, is that correct? A. That's what you are saying.

"Q. I asked you did you forcibly have intercourse with her? A. I said, no.

"Q. Did you have intercourse with her? A. I am not answering that. You said intercourse or sexual intercourse.

"Q. Sexual intercourse. A. No.

"Q. How long did you stay in Margie Hughes' room? A. I am not answering that, either.

"Q. What time did you leave her room? A. I am not answering that.

"Q. Why did you refuse to answer these questions? A. Because I don't know what this is all about.

"Q. You have been told, haven't you, that you are charged with punching, hitting Margie Hughes, cutting her with a penknife in the breast and finger and then, by force, compelling her to have intercourse with you. Didn't the detectives tell you that before I started taking the statement from you? A. Which detective is this?

"Q. Were you told that you were charged with Rape in the 1st Degree? A. That's all I was told.

"Q. I am telling you now that you are charged with forcibly having intercourse with Margie Hughes at her furnished room on January 28th, 1950, at about 3:30 in the morning. Do you desire to make any explanation concerning that? A. Am I indicted?

"Q. You are. A. I have no statement.

"Q. After you left Margie Hughes' room on the morning of January 28th, 1950, where did you go? A. At my home, 1746 Bathgate Avenue.

"Q. What time did you get to your home? A. Maybe three o'clock.

"Q. Didn't you tell me that you came to Margie Hughes' room between two and three in the morning? A. I say it could have been between two and three.

"Q. Isn't it a fact that three days after this occurrence on January the 28th, 1950, you left the City of New York to go to Michigan? Didn't you? A. That's a fact.

"Q. Isn't it a fact that you knew the police were looking for you on complaint of Margie Hughes? A. That's not a fact. I didn't know that. Statement concluded."