**UNITED STATES of America ex rel. Murray DICKERSON**

v.

**Alfred T. RUNDLE, Superintendent, State Correctional Institution, Philadelphia, Pennsylvania, Appellant.**

**No. 17629.**

United States Court of Appeals, Third Circuit.

Argued Jan. 21, 1969.

Reargued Nov. 5, 1969.

Second Reargument May 26, 1970.

Decided July 21, 1970.

James D. Crawford, Asst. Dist. Atty., Philadelphia, Pa., (Joseph J. Musto, Asst. Dist. Atty., Richard A. Sprague, First Asst. Dist. Atty., Arlen Specter, Dist. Atty., on the brief) for appellant.

Howard L. Schambelan, Cohen, Shapiro, Berger, Polisher & Cohen, Philadelphia, Pa. (David Berger, Walter Stein, Berger & Stein, Philadelphia, Pa., on the brief) for appellee.

David Rudovsky, Melvin Dildine, Vincent J. Ziccardi, Defender Assn. of Philadelphia, Philadelphia, Pa., amicus curiae, on the brief for appellee.

Argued Jan. 21, 1969

Before HASTIE, Chief Judge, and McLAUGHLIN and STAHL, Circuit Judges.

Re-Argued Nov. 5, 1969

Before HASTIE, Chief Judge, and McLAUGHLIN, FREEDMAN, SEITZ, ALDISERT, STAHL, and ADAMS, Circuit Judges.

Re-Argued May 26, 1970

Before HASTIE, Chief Judge, and McLAUGHLIN, FREEDMAN, SEITZ, ALDISERT, ADAMS, and GIBBONS, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

For the second time, we are called upon to review the conviction of Murray Dickerson for the murder of a Philadelphia housing project guard in 1958. As before, at issue is the admissibility of a statement given to the police at a time when Dickerson was without legal counsel and incarcerated by order of a committing magistrate. In order to evaluate the assertions of Fifth and Sixth Amendment deprivations, it is necessary to review the history of the extensive legal proceedings which have preceded this appeal.

Dickerson was convicted of murder by a Pennsylvania jury in 1960. He unsuccessfully appealed this conviction to the state supreme court which held in Commonwealth v. Dickerson, 406 Pa. 102, 176 A.2d 421 (1962), that the voluntariness *vel non* of the statement given to the police rested finally with the jury and would not be disturbed on review. This position was reiterated in a subsequent denial of state habeas corpus relief in Commonwealth ex rel. Dickerson v. Rundle, 411 Pa. 651, 192 A.2d 347, cert. den. 375 U.S. 915, 84 S.Ct. 214, 11 L.Ed.2d 154 (1963).

Resorting to federal habeas action, however, Dickerson was successful in overturning his conviction on two grounds. In United States ex rel. Dickerson v. Rundle, 238 F.Supp. 218 (E.D. Pa.1965), Judge Wood ruled that Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) required a separate hearing on the voluntariness of the statements, and Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) and Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12

L.Ed.2d 246 (1964), rendered the statements inadmissible as a matter of law due to the absence of counsel. It should be emphasized that all these Supreme Court decisions had been announced subsequent to the Pennsylvania state courts' review of the conviction.

On appeal, however, this court rejected the contention that Dickerson's statement was inadmissible "merely because it was given at a time when he was without the assistance of counsel." United States ex rel. Dickerson v. Rundle, 363 F.2d 126, 129 (3 Cir. 1966), cert. den. Dickerson v. Rundle, 386 U.S. 916, 87 S.Ct. 880, 17 L.Ed.2d 790 (1967). Instead, we remanded the case to the state courts solely for the purpose of conducting a Jackson v. Denno hearing on the issue of voluntariness.

On remand, the state trial court determined that the statement was voluntarily given. By agreement of the parties, this finding was made on the basis of the testimony presented in the federal proceedings before Judge Wood. This holding was affirmed by the Pennsylvania Supreme Court for the third time in Commonwealth v. Dickerson, 428 Pa. 564, 237 A.2d 229 (1968), with Justice Roberts dissenting on the grounds that the police violated the defendant's right to counsel when they obtained a "bring-up order" authorizing interrogation without affording or advising the defendant of his right to counsel.

Returning to the federal courts, Dickerson reiterated his arguments on voluntariness and the right-to-counsel. Based on the same record which the state courts had reviewed, the district court concluded that the statement was involuntary. In issuing the writ, the court requested, if an appeal ensued, that we reconsider our prior decision which rejected the Sixth Amendment claim. After argument before a panel and two separate rehearings *en banc*, we have concluded that the writ should not issue.

*The Voluntariness of the Statement*

■ Section 2254(d) of Title 28 provides that in federal habeas corpus applications, state adjudications "shall be presumed to be correct." It is only where "such factual determination is not fairly supported by the record" that a federal court is authorized to reject the state findings. Notwithstanding this admonition, the district court rejected the state finding of voluntariness on the basis of the identical evidence reviewed by the state courts. Having examined this record ourselves, we conclude that the state adjudication is more than fairly supported and should have been accepted by the district court.

The record shows that Dickerson voluntarily surrendered to the police three days after the housing guard was killed. There followed a period of interrogation from 5:20 p.m. to 9:18 p.m. on August 19, 1958. A preliminary hearing was held on the morning of August 20 for Dickerson and a co-suspect, Spencer Broaddus,[1] after which both men were held for the grand jury. Within a few hours after the defendants were committed to the county prison, the detective bureau requested and obtained from a state quarter sessions judge a "bring-up order" which authorized removal of the defendants from prison for further police interrogation. A second round of questioning followed from 3:16 p.m. to 9:41 p.m. on August 20, at the conclusion of which Dickerson gave the statement which he attacks as involuntary. The interrogations of both Dickerson and Broaddus were apparently conducted by five police officers who at times employed the "Mutt and Jeff" technique of friendship and hostility. A lie detector test was also administered during the course of the second interrogation, following which the police accused Dickerson of lying. At the time these events transpired, Dickerson was 21 years old with nine years of formal education.

1. After Spencer Broaddus entered a plea of guilty and was sentenced, he, too, initiated a collateral attack on the state proceedings. United States ex rel. Broaddus v. Rundle, 429 F.2d 791 (3 Cir. 1970).

We experience difficulty in equating these circumstances with those in cases such as Cicenia v. Lagay, 357 U.S. 504, 78 S.Ct. 1297, 2 L.Ed.2d 1523 (1958); Crooker v. California, 357 U.S. 433, 78 S.Ct. 1287, 2 L.Ed.2d 1448 (1958); Spano v. New York, 360 U.S. 315, 79 S. Ct. 1202, 3 L.Ed.2d 1265 (1969); Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963) and Davis v. North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966), relied on by Dickerson to establish his claim of involuntariness. Certainly the facts here in no way approach those in *Culombe*, where the accused was a "moron or imbecile" who was subjected to five days of interrogation; or *Davis*, where sixteen days of incommunicado interrogation finally resulted in the extraction of a confession from an illiterate of very low mentality; or *Crooker*, where the accused was interrogated through the night with no opportunity for sleep; or *Spano*, where the intervention of a "friend" who was in fact a police officer resulted in a confession after eight hours of continuous interrogation into the middle of the night.

In contrast to these cases, the factual construct here is too frail to overturn the state adjudication that the confession was voluntary. There is nothing in Dickerson's age, intelligence, or background which might indicate any great susceptibility to psychological coercion. And the question of the use of physical force is not even raised. Nowhere is it suggested that ample time for eating, sleeping, or resting was not afforded in the long interim between the two interrogations on August 19 and 20, or even during the interrogations themselves. And although it is true that the police did not give Dickerson what has become known as the *Miranda* warning, it should be emphasized that the presence of this factor does not justify a finding of coercion absent a convincing factual array. In virtually every case relied upon by Dickerson in support of the in-voluntariness claim—*Davis, Haynes, Culombe, Spano, Cicenia,* and *Crooker*—the failure to caution the accused of his rights or an outright refusal to honor a request for counsel was but one factor in a blend of ingredients from which a conclusion of coercion was extracted. We find no such blend here; absent this, the state adjudication of voluntariness should stand.

### The Right to Counsel

As noted previously, when this case was last before us we rejected the contention that Dickerson's statement was inadmissible because it was obtained when he was without counsel. In adopting a contrary position, the district court relied on the authority of two decisions: Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) and Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). Both these decisions have since been declared non-retroactive in application. *Escobedo* in Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966), and *Massiah*, by this Circuit last year, in United States ex rel. Allison v. New Jersey, 418 F.2d 332 (3 Cir. 1969). Consequently, if Dickerson's 1960 conviction is to be reversed because he was denied the right to counsel, it must be on the basis of some other decisional law.

We stress that we are confronted here with the issue of the retroactive application of certain constitutional principles to an interrogation which occurred in 1958—eight years before the *Escobedo* and *Massiah* decisions. Were we reviewing an interrogation which post-dated these cases, there is no question that Dickerson's post-preliminary hearing interrogation could not have been effected without at least prior warnings of his constitutional rights. The authority of *Escobedo*, or *Massiah*, and the later case of *Miranda* would dictate such a result. Where the question of retroactivity is concerned, however, different considerations apply. First and foremost, it is essential that we determine by what de-

cisional authority this appeal is governed. Dickerson urges the application of White v. Maryland, 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963), retroactively applied in Arsenault v. Massachusetts, 393 U.S. 5, 89 S.Ct. 35, 21 L.Ed. 2d 5 (1968). In *White,* the Supreme Court held that the Sixth Amendment required the assistance of counsel at a preliminary hearing where a plea of guilty was entered. It is Dickerson's position that the right to counsel recognized in *White* applies to all judicial proceedings, and in this case required the presence of defense counsel at the time the application for the "bring-up order" was presented to the quarter sessions judge.

■ The doctrines of White v. Maryland, *supra,* Hamilton v. Alabama, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114 (1961), and Massiah v. United States, *supra,* are judicially crafted benchmarks which delineate particular phases in criminal proceedings when the right to counsel attaches absolutely under the Sixth Amendment. But this right attaches not so much by the chronology of proceedings or even by the interposition of ancillary judicial proceedings as it does by the accumulation of a circumstantial complex which heightens the probability that there will be violence to the constitutional rights of one whom the authorities are prosecuting. Thus, simply appearing at the preliminary hearing, without being required to testify or plead, is not such a critical period as to require the presence of counsel. United States ex rel. Budd v. Maroney, 398 F.2d 806 (3 Cir. 1968), citing Commonwealth ex rel. Parker v. Myers, 414 Pa. 427, 200 A.2d 770 (1964).

■ Similarly, the judicial proceedings designed to cause a "bring-up order" to issue was not a critical proceeding. The issuance of the "bring-up order" for Dickerson was not a judicial inquiry into the guilt *vel non* of the defendant; it was an administrative procedure authorizing the transfer of the prisoner from the county prison to police headquarters to make him available for questioning. Prior to the preliminary hearing, the prisoner could have been moved from one police lockup to another stationhouse or to detective headquarters without the necessity of any court order. Such movement, in and of itself, would not create a situation in which there would be a right to counsel. The issuance of a court order which accomplished, after a preliminary hearing, that which could have been effected before the hearing without such an order does not, in our view, constitute the critical event in the chain of proceedings. What is significant about the experience of Dickerson was not his temporary *release* from the prison by means of the "bring-up order," but his *incarceration* in that prison as a result of the preliminary judicial proceeding. Certainly, if after the preliminary hearing there had been police interrogation of Dickerson at the prison, without the intervention of a court order bringing him up to police headquarters, the critical nature of the proceedings would not have been diluted. Such an interrogation at that time—under any circumstances, inside or outside the prison, with or without a "bring-up order"— would not have thrust the prisoner beyond the pale of Sixth Amendment protection.

■ The predicate to the "critical stage" here was the committing magistrate's action at the preliminary hearing. It is the decision of the judicial officer to hold an accused for court to await grand jury action which affixes the label of "defendant" upon a person who hitherto was only a suspect in the police investigative process; once that label attaches, the absolute right of counsel also attaches in any situation where prejudice may result to the accused. And the right of counsel attaches at this time precisely for the same reasons it attaches following the formal rendition of an indictment by a grand jury. Massiah v. United States, *supra;* United States ex rel. O'Connor v. New Jersey, 405 F.2d 632 (3 Cir. 1969).

■ The root question thus relates not to his being questioned during a

"critical period," but to what was the generating source of the "period." Upon this determination hangs the question of retroactivity which is the controlling issue in this case.

As we have heretofore indicated, we do not believe that the routine request for the bring-up order and the subsequent signing of such an order by the judge generated the "critical period." Instead, it is our view that the significant event in this case was the action taken in the earlier preliminary hearing. Accordingly, we believe that after the preliminary hearing Dickerson stood in the same legal shoes as did the defendant in *Massiah* for exactly the same reasons, and, therefore, it is the doctrine of *Massiah* and not *White* which must control this case. This dictinction is crucial because, as noted above, the full retroactivity afforded *White* by *Arsenault* has been denied *Massiah* by the holding of this court in United States ex rel. Allison v. New Jersey, *supra*.

In both *Massiah* and *Allison* the defendant was interrogated after indictment without counsel. Having denied retroactive relief to Allison, who relied on the authority of *Massiah*, it would be incongruous to afford relief to Dickerson whose interrogation occurred at an earlier and, conceivably, more formal stage in the proceedings. Surely Allison's interrogation occurred at a stage equally as critical as Dickerson's.

Assuming that this Circuit and the others which have confronted the application of *Massiah* have acted correctly in denying it retroactivity, United States ex rel. Romano v. Fay, 360 F.2d 389 (2 Cir. 1966); Lyles v. Beto, 363 F.2d 503 (5 Cir. 1966); United States ex rel. Long v. Pate, 418 F.2d 1028 (7 Cir., Nov. 18, 1969), the conclusion appears inescapable that *White*, insofar as the issue of retroactivity is concerned, must be confined to its facts, that is, the recognition of the right to counsel at formal judicial proceedings at which the defendant, by action or inaction, may lose substantial rights. Police interrogations cannot readily be included in this category. Furthermore, such a construction of the holding in *White* is thoroughly consistent with the retroactivity which was afforded in right-to-counsel cases such as Gideon v. Wainwright and Hamilton v. Alabama, while being consonant with the denial of retroactivity in decision such as Wade v. Gilbert and *Massiah*, which are also bottomed on the Sixth Amendment. The former group of cases involves the right to counsel at formal adversary proceedings where an "adjudication" made without legal assistance must be conclusively presumed to infect the very integrity of the proceedings. See McConnell v. Rhay, 393 U.S. 2, 89 S.Ct. 32, 21 L. Ed.2d 2 (1968). The latter group, while concerned that convictions not be obtained through extra-judicial methods deemed constitutionally infirm, recognizes that the absence of counsel at certain police proceedings does not foreclose the defendant from effectively and ultimately attacking, in a judicial setting with the assistance of counsel, the evidence obtained in violation of fundamental due process. Thus, interrogations can still be attacked as coercive, and lineups as unduly suggestive.

What has assisted the courts in differentiating the two groups of cases has been a calculated judgment, succinctly expressed in Johnson v. New Jersey, *supra*: "We are thus concerned with a question of probabilities and must take account, among other factors, of the extent to which other safeguards are available to protect the integrity of the truth-determining process at trial." 384 U.S. at 729, 86 S.Ct. at 1779. Indeed, *Johnson*, although concerning itself directly with the retroactivity of *Escobedo* and *Miranda* and denying the extension of these doctrines, nonetheless presented a factual complex identical in relevant detail to the one portrayed here:

The police took petitioner Johnson into custody in Newark, New Jersey, at 5 p.m. on January 29, 1958, for the same crime as Cassidy. He was taken to detective headquarters and was booked. Later in the evening the po-

lice brought him before a magistrate for a brief preliminary hearing. The record is unclear as to what transpired there. Both before and after the appearance in court, he was questioned in a routine manner. At 2 a.m. the police drove Johnson by auto to Camden, the scene of the homicide, 80 miles from Newark. During the auto ride he was again interrogated about the crime. Upon arrival in Camden at about 4:30 a.m., the police took him directly to detective headquarters and brought him before the chief detective, three other police officers, and a court stenographer. * * * The police then interrogated him until 6:20 a.m., a period of about one and one-half hours. During the course of the questioning, he made a full confession to the crime of felony murder.

Id. at 723, 86 S.Ct. at 1775.

Against the factual background of this landmark case which has denied retroactivity to *Escobedo* and *Miranda*, we cannot say that the Supreme Court was oblivious to the fact that the interrogation took place following the preliminary hearing. The denial of relief in *Johnson* can easily be construed as a silent rejection of the applicability of the rule of White v. Maryland to cases such as the one presented by this appeal.

Moreover, there is abundant justification for the denial of retroactivity in such cases. The practice of holding post-preliminary hearing interrogations without counsel has undoubtedly been a wide-spread practice in many states. In fact, the "bring-up order" involved here was printed on a standard form, and was so much a matter of routine that the orders were not made a part of the court's record. To void interrogations made under the authority of *White* would create a hurricane of habeas corpus applications on an already overburdened judiciary, both state and federal. Irrespective of the philosophical difference which might be used to distinguish the various decisions, this final factor alone is weighty reason to deny retroactivity.

In conclusion, we reiterate that we do not consider *White, Gideon, Hamilton, Wade* or *Massiah* as stating separate and distinguishable rules of law, but rather as separate enunciations of the same principle: the Sixth Amendment right to counsel. Thus, where only the prospective application of this principle is concerned, we hold that the authority of any and all of these decisions establishes the right to counsel at interrogation following judicial proceedings at which an accused is formally charged with a criminal violation.

Where the question of retroactivity is concerned, however, we are compelled to conclude that (1) *White* and *Hamilton* cannot be applied to factual situations different from those presented in those cases, *i.e.* they must be confined to those situations where substantial rights may be lost by defendant's action or inaction at formal judicial proceedings, and (2) the decision and rationale of this court in Allison must be applied to the case at bar.

Although Dickerson's interrogation took place at a "critical stage" of the proceedings, as did the defendant's in *Massiah*, logic and sound · judicial precedent compel us to reject Dickerson's right to counsel claim solely on the basis of retroactivity considerations.

The opinion of the court was written prior to the Supreme Court's recent decision in Coleman v. Alabama, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (June, 1970). Members of the court who join in the majority opinion do not consider that *Coleman* compels a different result here.

Accordingly, the judgment of the district court will be reversed.

HASTIE, Chief Judge, dissenting.

In the ongoing process of incorporating into the Fourteenth Amendment such particular provisions of the Bill of Rights as the right to the assistance of counsel and the guarantee of freedom from self-incrimination, with the technical definitive gloss that attends each of

them, there is danger that the comprehensive independent reach and role of the Due Process Clause in criminal procedure be obscured. And in some cases, among them this one, that obscuration can result in judicial analysis that unduly restricts the protection afforded to accused persons by the Fourteenth Amendment.

On its face and in historic reading, the Due Process Clause of the Fourteenth Amendment requires that the procedure through which a state obtains a conviction of crime be essentially fair. Thus, long before the Supreme Court announced the incorporation of the Fifth Amendment prohibition of compulsory self-incrimination and the Sixth Amendment guarantee of the assistance of counsel as specific requirements of due process,[1] coercive methods used in obtaining a confession and prejudicial failure to provide an accused with the assistance of counsel were recognized by the Supreme Court as important circumstances that should be considered in determining whether challenged procedure that had led to a criminal conviction was so unfair or indecent that it could not be squared with the constitutional concept of due process of law.[2] This approach to and understanding of the Due Process Clause was not attended by any question of the retrospective application of the holdings of particular decisions. But it did recognize that a court may properly aggregate elements of unfairness and impropriety in the obtaining of a conviction, no one of which alone may be decisive, and conclude on that basis that the procedure by which a jury was persuaded to convict or, more narrowly, by which damaging admissions were obtained from the accused, was less than due process.[3] To state the matter somewhat differently, the proper performance of the judicial function under the Due Process Clause often requires "an exercise of judgment upon the whole course of the proceedings in order to ascertain whether they offend those canons of decency and fairness which express * * [our] notions of justice * * *." Malinski v. New York, 1945, 324 U.S. 401, 416–417, 65 S.Ct. 781, 789, 89 L.Ed. 1029 (Frankfurter, J., concurring).

More particularly, the majority opinion convincingly demonstrates that if, at any time since the 1964 decision of the Supreme Court in *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246, a police interrogation in the absence of counsel had elicited an incriminating statement from a prisoner in Dickerson's position, the use of that statement as evidence would be precluded as violative of the Sixth Amendment. In the view of the Court the denial of the assistance of counsel at any critical stage of a criminal proceeding was so grossly unfair to the accused that it justified this constitutional prohibition. Only the technical operation of a judicial concept of nonretroactivity prevents the *Massiah* rule from applying here. But that technicality cannot make the denial of counsel at a critical stage of a criminal proceeding, which is unconstitutional to-day, wholly unobjectionable when it was experienced by Dickerson in 1958. *Massiah* did not make the procedure there condemned unfair. Rather, judi-

---

1. Gideon v. Wainwright, 1963, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799, overruling Betts v. Brady, 1942, 316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595, Malloy v. Hogan, 1964, 379 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653, overruling Adamson v. California, 1947, 332 U.S. 46, 67 S.Ct. 1672, 91 L.Ed. 1903.

2. *E. g.*, Harris v. South Carolina, 1949, 338 U.S. 68, 69 S.Ct. 1354, 93 L.Ed. 1815; Townsend v. Burke, 1948, 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690.

3. The Supreme Court has stated and applied this principle repeatedly. *E. g.*, Payne v. Arkansas, 1958, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975; Fikes v. Alabama, 1957, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246. Its validity is in no way impaired by the fact that its invocation has been unnecessary in many recent cases because the Court has found a violation of a specific provision of the Bill of Rights.

cial perception of unfairness made *Massiah.*

It follows that the technical non-retroactivity of the constitutional rule of *Massiah* should not prevent us from recognizing, consistent with the underlying justification of that decision, that there was a significant element of unfairness in police interrogation of Dickerson after he had been charged and committed, and after he had vainly requested the assistance of counsel. This element of unfairness should be considered, together with whatever other circumstances may be relevant, in reaching an ultimate decision whether the entire procedure that led to Dickerson's statement was sufficiently unfair to constitute a denial of due process of law. It has already been pointed out that this approach is firmly rooted in the jurisprudence of the Supreme Court. Indeed, the Court has been very explicit in saying that, "in judging whether state prosecutions meet the requirements of due process, [it] has sought to achieve a proper accommodation by considering a defendant's lack of counsel one pertinent element in determining from all of the circumstances whether a conviction was attended by fundamental unfairness." Cicenia v. Lagay, 1958, 357 U.S. 504, 509, 78 S.Ct. 1297, 1300, 2 L.Ed.2d 1523.

Similar reasoning applies to the separate contention, also rejected by the majority, that Dickerson's statement was "involuntary" so that its use amounted to compulsory self-incrimination in violation of the Fifth Amendment. Although on the entire record there was enough to justify the state courts' finding that Dickerson was not subjected to physical abuse, I think we all agree that this record contains a substantial unrefutted showing that his interrogation was characterized by significant pressure, short of brutality. Very damaging admissions were obtained by the police through a five hour interrogation of the accused after a preliminary hearing at which he had been charged with homicide and formally committed to prison to await grand jury action. Moreover, that interrogation had been facilitated by an ex parte "bring-up order" in which a judge authorized a temporary transfer of custody of the accused from the prison authorities to the police, thus permitting undisturbed interrogation in a place chosen by and under control of the police. All of this occurred while the accused was without counsel and after he had asked for and had been denied an opportunity to communicate with "my people or a lawyer."

The actual interrogation pursuant to the "bring-up order" was attended by several objectionable procedures. Pressure upon the accused is apparent in the record. The interrogation continued for more than five hours. Five hours of questioning about the uncomplicated circumstances of the homicide, particularly after the accused already had made a rather full earlier statement, is in itself a significant indication that pressure was being applied. The interrogation was conducted by five detectives employing a "Mutt and Jeff" routine under which a period of antagonistic interrogation by one detective was followed by friendly cajoling on the part of another. Pressure also was exerted by administering a "lie-detector test" and then telling the prisoner, apparently without justification, that this procedure established as a fact that he was lying. Though we accept the finding of the state court that no brutality occurred, these more subtle methods of applying pressure employed by the police, which after five hours created "willingness" to talk, were in themselves objectionable. Moreover, the "statement" signed by the prisoner is obviously not in his own words. Rather, it is something prepared by the police as embodying the useful substance of what had been said. Perhaps, standing alone, these characteristics of the interrogation, different from physical abuse, were not such serious improprieties as to amount to a denial of due process. But they are serious official improprieties and significant elements of wrong in the total procedure

that produced the incriminating statement.

· Finally, it is significant that the five hour uninterrupted interrogation of Dickerson in a place other than the prison, selected by the police and under their control, was made possible by an ex parte "bring-up order" signed by a judge at the request of the police. As a result of a preliminary hearing Dickerson had been duly committed to prison, there to be kept safely pending further action on the charge against him. If thereafter relatives, friends or counsel had wished to talk to him, they would have been required to do so at a designated place in the prison and subject to whatever may have been the prison rules and practices regulating visitation to prisoners. I am unable to believe that any court would have granted defense counsel an ex parte "bring-up order" to permit counsel to interview his client privately in counsel's office for the better preparation for trial. Yet, a state judge authorized the police to remove Dickerson from prison to a place under exclusive police control and there, free of any possible interruption or interference, interrogate him for several hours. This court-sanctioned procedure served no purpose other than to facilitate such application of pressure upon the accused as might be necessary to induce him to make such a statement as the police desired to strengthen the case against him.

When this case was before the Supreme Court of Pennsylvania on Dickerson's appeal from a denial of state habeas corpus, that court affirmed the denial without opinion. Commonwealth v. Dickerson, 1968, 428 Pa. 564, 237 A.2d 229. However, Mr. Justice Roberts filed a dissenting opinion in which he discussed the nature and significance of the "bring-up order". I quote a part of his opinion which to me is wholly persuasive that the questioned procedure was unfair:

"Although in Dickerson's direct appeal this Court insisted that there was 'nothing sinister or secretive' about the bring-up procedure, I believe that both of these adjectives *are* unquestionably applicable. Not only was this bring-up order issued ex parte, but it is also condemned by state statute. [The Act of February 18, 1785, 2 Sm. L. 275, § 12, 12 P.S. § 1887]. Judge Finletter, in ringing language with which I heartily concur, highlighted the evils inherent in this practice. See Commonwealth v. Brines, 50 C.C. R. 68, 29 Dist. 1091 (1920):

'I do not see that I have any power, by my mere order, to take the defendant against his will from the county prison, to which he has been lawfully committed to await trial, for any other purpose connected with his case except the trial.

'By the terms of the commitment, he is to remain in the county prison to answer the charge of murder, not to answer the call of any and every person, official or other, who may wish to meet him or speak to him. If his presence elsewhere is needed to answer any lawful demand which he would be compelled to answer if at liberty, it may be secured by a proper writ of *habeas corpus*.

'It seems to be forgotten that an accused is not a convict, and that it is only strong necessity that compels his detention *before* trial. It is a restraint of the liberty of his person which is unavoidable. It certainly should not be aggravated by the infliction of any unnecessary indignity.

'An accused, but unconvicted, prisoner is not to be bundled about the county at the beck and call of every policeman or prosecutor who may wish to see him.'" 428 Pa. at 567–568, 237 A.2d at 231.

Thus, the entire questionable interrogation was made possible by unwarranted action on the part of a state judge. This is yet another distinct impropriety in the whole course of official conduct, the end product of which was a statement that was used against Dickerson at his trial.

**472**

My conclusion from all of this is that the totality of the circumstances that led to the incriminating statement—particularly, the ex parte bring-up order, the undisputed indicia of pressure during interrogation and the denial of the requested assistance of counsel throughout all of this procedure—discloses too much unfair and potentially prejudicial official conduct to consist with due process of law. Therefore, I would affirm the judgment granting habeas corpus.

FREEDMAN and ADAMS, Circuit Judges, join in this dissent.

ADAMS, Circuit Judge, dissenting.

Although I am in accord with Chief Judge Hastie's opinion and concur with his conclusion that under the "totality of circumstances" Dickerson was denied the due process of law contemplated by the Fourteenth Amendment, I am constrained to file this separate opinion to point out that even if the approach of the majority is adopted— an approach which is in certain respects a mechanical one—the grant of the writ of habeas corpus should nonetheless be affirmed.

The majority concludes that the interrogation following the bring-up order was the critical stage at which the right to counsel attached, but that the proceeding before the court when the bring-up order was issued was not a critical stage so as to require the presence of counsel. The majority then proceeds to decide that Dickerson's confession, although obtained without the presence of counsel, was admissible because this Court has ruled that Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), in which the crucial interrogation took place after indictment, is not retroactive. United States ex rel. Allison v. New Jersey, 418 F.2d 332 (3d Cir. 1969).

The majority's conclusion ignores the fact that the interrogation of Dickerson was conducted pursuant to the judicial sanction of the bring-up proceeding. Were is not for the signing of the bring-up order by a judicial officer, the second crucial interrogation could not have occurred in police headquarters. The bring-up proceeding which gave the police the opportunity to question Dickerson at length without counsel was therefore a critical stage in the Commonwealth's proceeding against Dickerson, and the defendant's rights regarding such stage may appropriately be traced to White v. Maryland, 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963), which is retroactive. Arensault v. Massachusetts, 393 U.S. 5, 89 S. Ct. 35, 21 L.Ed.2d 5 (1968). The decisions in *Massiah* and *Allison* did not involve interrogations authorized by *judicial* proceedings, and do not therefore provide the applicable rule governing the case here.

In *White*, the Supreme Court said that counsel was required at a preliminary hearing because the hearing at which the defendant pleaded guilty, although not required to do so, was a critical stage in the criminal prosecution. *Accord,* Commonwealth ex rel. Firmstone v. Myers, 431 Pa. 628, 631, 246 A. 2d 371, 373 (1968).

To avoid the impact of the rulings of *White* and Hamilton v. Alabama, 368 U. S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114 (1961), the majority takes the position that these cases are "confined to those situations where substantial rights may be lost by defendant's action or inaction at formal judicial proceedings." But such a narrow interpretation rewards the state if it acts ex parte, and penalizes the state if it conducts a formal hearing at which the defendant is present. The majority would quite probably concede that if Dickerson were present at the bring-up proceeding, he would have been entitled to counsel. Since, however, the bring-up order was signed ex parte, he is not afforded that right.

In addition, the majority fails to recognize that the decisive element of a judicial proceeding which makes it a "critical stage" is the consequential effect of the proceeding on the defendant. The majority's conclusion also appears to be

inconsistent with the Supreme Court's recent decision in Coleman v. Alabama, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970) which squarely holds that a defendant has a right to counsel[1] at a preliminary hearing because such a hearing is a critical stage in the judicial proceeding.

In *Coleman* the Supreme Court recognized that a defendant may be prejudiced by lack of counsel at pretrial judicial proceedings although the defendant does not say or do anything at such proceeding which is subsequently used as evidence against him at trial. As Justice Brennan pointed out, the role of counsel is to protect the defendant "against erroneous or improper prosecution". Counsel may be able to affect the proceeding for the defendant's benefit or turn it toward a course which protects the defendant's rights.

Dickerson did not have counsel at his preliminary hearing or at the bring-up proceeding. In Coleman the Supreme Court said that unless the absence of counsel is harmless error a new trial

must be ordered. The case was remanded to the state court to determine, in the first instance, the question of harmless error.[2]

It is clear on the record here that Dickerson was prejudiced by lack of counsel at the bring-up proceeding. As a result of that proceeding, a statement was obtained which was undoubtedly the most damaging evidence against him.[3] An attorney for Dickerson at the bring-up proceeding would have objected to the transfer of Dickerson to police custody for continuous police interrogation without counsel. Thus, Dickerson's second statement was the "fruit" of his lack of representation at the bring-up proceeding, and therefore inadmissible. *Cf.* Vale v. Louisiana, 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970).

I would affirm the District Court's grant of the writ of habeas corpus so that Dickerson may be afforded a new trial for the reasons enunciated by Chief Judge Hastie as well as those set forth in this opinion.

1. Although an *amicus* brief filed in *Dickerson* urged this Court to adopt the position taken by the Supreme Court in *Coleman*, the majority does not refer to the contention set forth in the *amicus* brief. Indeed, it mentions the *Coleman* decision only briefly.

2. Although the retroactivity of *Coleman* has not yet been decided, it would appear to be retroactive since it is akin to the decisions guaranteeing a defendant the right to counsel at various in-court *judicial* proceedings in a criminal prosecution which have been held retroactive. Arsenault v. Massachusetts, holding White v. Maryland retroactive; Doughty v. Maxwell, 376 U.S. 202, 84 S. Ct. 702, 11 L.Ed.2d 650 (1964), holding Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (right to counsel at trial for serious crimes) retroactive; Smith v. Crouse, 378 U.S. 584, 84 S.Ct. 1929, 12 L.Ed.2d 1039 (1964) holding Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963) (right to counsel on appeal) retroactive; McConnell v. Rhay, 393 U.S. 2, 89 S.Ct. 32, 21 L.Ed.2d 2 (1968), holding Mempa v. Rhay, 389 U.S. 128, 88 S.Ct. 254, 19 L. Ed.2d 336 (1967) (right to counsel at rev-

ocation of probation and imposition of deferred sentencing) retroactive. The major decisions denying retroactivity involve the right to counsel at critical stages outside the courtroom. *E. g.,* Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966), denying retroactivity to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), denying retroactivity to United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L. Ed.2d 1149 (1967) and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L. Ed.2d 1178 (1967). Because of reliance on White v. Maryland in this dissenting opinion it is not necessary to pass on the question of retroactivity.

3. The statement given by Dickerson at the second interrogation—that he hit the guard, took the guard's black jack and sold it the next day for $1.25—was the only statement which supported Dickerson's conviction for first degree "felony murder." During the earlier interrogation Dickerson denied any involvement with the guard and always contended that he was not present when Broaddus killed the guard.